

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 22, 2019

<u>BY ECF</u>

The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

> Re:  *United States v. Todd Howe*,
>        **16 Cr. 632 (VEC)**

Dear Judge Caproni:

   The Government respectfully submits this letter to advise the Court of pertinent facts concerning the assistance Todd Howe rendered in the investigation and prosecution of seven individuals engaged in corruption and fraud at the highest levels of New York State government. In light of these facts, and assuming that Howe complies with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines and Section 3553(e) of Title 18, United States Code, that the Court sentence Howe in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.  Howe is scheduled to be sentenced on April 5, 2019, at 2:00 p.m.

<u>**The Underlying Criminal Conduct**</u>

   Todd Howe pleaded guilty to an eight-count Information charging him in three separate criminal schemes: (i) embezzlement from his employer and related tax evasion; (ii) participation in a bribery and honest services fraud scheme involving Joseph Percoco, a senior aide to New York Governor Andrew Cuomo, and executives of two companies; and (iii) a conspiracy with SUNY Poly President Alain Kaloyeros and several real estate executives to rig contracts for large New York State economic development projects under Governor Cuomo's signature economic development initiative, the Buffalo Billion program.  (PSR ¶¶ 1-11).  Given the Court's familiarity with the record in this case, and in particular with Howe's criminal conduct based on his extensive trial testimony, the Government has briefly summarized Howe's conduct below.

**I.      Howe's Embezzlement and Tax Evasion**

   During the relevant time period, Howe served as President and the primary employee of Whiteman, Osterman & Hanna ("WOH") Government Solutions, a government relations firm in Washington, D.C. that was a subsidiary of a law firm located in Albany, New York.  (PSR ¶ 29).

Between 2009 and 2016, Howe embezzled more than $1.7 million from WOH by depositing checks intended for WOH into accounts Howe controlled, including an account for a shell company he created called Potomac Strategies LLC and a bank account he set up in WOH's name without WOH's authorization.  (PSR ¶ 32, 45).  In addition to stealing WOH's funds, Howe also submitted fraudulent travel reimbursement requests to WOH totaling thousands of dollars.  (PSR ¶ 46).  Howe also failed to pay federal taxes between 2010 and 2015 on the money he embezzled, resulting in a federal tax liability of $714,027.  (PSR ¶ 47).

In connection with his cooperation and the sale of his Washington D.C. home, Howe agreed to a tax payment plan with the Internal Revenue Service ("IRS").  He paid an initial lump sum of $190,000 in March 2017, from the proceeds of the sale, and agreed to pay $1,000 per month on an ongoing basis toward his tax liability.  The Government permitted Howe to set aside approximately $80,000 of the proceeds of the sale to cover his monthly tax obligation and reasonable living expenses.  Rather than use that money to make payments toward his tax liability, Howe spent almost all of it on personal expenses prior to his testimony at trial. (Tr. 2114-15).  Per IRS records, however, Howe has consistently made his $1,000 payment per month since May 2017.

The Government has been advised by the IRS that, to date, Howe has paid approximately $213,000 of his outstanding tax liability.  In addition, in lieu of filing amended returns for the tax years 2010-2015, Howe consented to the necessary adjustments, which have been made.  At present, Howe's obligations for tax years 2010 and 2011 have been fully paid.  Howe has also filed accurate tax returns for 2016 and 2017.

Howe also owes restitution of more than $1.7 million to WOH, as set forth at page 9 below.

## II.     The Percoco Bribery Scheme

Between at least 2012 and 2016, Howe facilitated a significant scheme to bribe Joseph Percoco, Howe's long-time friend and colleague.  (PSR ¶¶ 28, 31-37).  Howe arranged for his own clients – COR Development, a Syracuse, New York-based real estate development company, and Competitive Power Ventures ("CPV"), an energy company with operations in New York, to make surreptitious payments to Percoco, then a senior advisor in the Governor's Office, in exchange for Percoco's agreement to take, and actually taking, official action to benefit those clients.  (*Id.*).

For CPV, in coordination with CPV executive Peter Galbraith ("Braith") Kelly, Jr., Howe helped arrange a low-show job at CPV for Percoco's wife, in exchange for Percoco's agreement that he would take action to benefit CPV with regard to an ongoing State competition for a power contract, worth over $100 million, and as other opportunities arose.  (PSR ¶¶ 33, 35).  Howe later facilitated Percoco's efforts to direct State officials to enter into a "reciprocity agreement" with New Jersey, which allowed CPV to purchase needed energy credits in New York, ultimately saving the company more than $1.5 million.  (PSR ¶ 24, 35).  During the relevant time of the Percoco Bribery Scheme, CPV paid more than $800,000 to Howe, $474,000 directly to Howe, through Potomac Strategies, and $332,062 through WOH, of which Howe received a significant percentage.  (PSR ¶ 32).

For COR Development, Howe initially engaged Percoco to help COR Development avoid a costly, State-mandated labor agreement in connection with one of its development projects, and also sought Percoco's help getting State funds released to COR Development and securing a raise for COR Development executive Steven Aiello's son.  (PSR ¶ 36).  In exchange for Percoco's help, Howe arranged for COR Development to pay Percoco $35,000 through Potomac Strategies, the shell company controlled by Howe.  (Tr. 2098-99; GX 1606A, 1606B).  Howe received the money from COR Development in two separate checks, and then wrote checks to Percoco's wife, rather than paying Percoco directly.  (*Id.*).

## III.    The Buffalo Billion Scheme

From approximately 2013 through 2015, Howe facilitated a separate scheme, to rig the process of awarding New York State-funded construction contracts worth more than $850 million. At the time, Howe served as both a consultant to SUNY Poly President Alain Kaloyeros, and as a consultant to COR Development and LP Ciminelli, a Buffalo, New York-based construction management company.  Kaloyeros, in coordination with Howe, used his position and influence to tailor the bidding process for those contracts to favor Howe's clients – COR Development and LPCiminelli.  (PSR ¶¶ 38-41).  Kaloyeros, Howe, and executives from COR Development and LPCiminelli worked together to deceive Fort Schuyler Management Corporation (a SUNY-affiliated non-profit responsible for awarding the relevant contracts) by, among other things, secretly tailoring the required qualifications for those development deals so that COR Development and LPCiminelli would be awarded contracts in Syracuse and Buffalo, respectively, without meaningful competition, while falsely representing to Fort Schuyler that the bidding process was legitimate and competitive.  (PSR ¶ 42).

During the relevant time of the charged crimes, SUNY Poly, COR Development, and LPCiminelli collectively paid at least $2 million to Howe, directly and through contracts with WOH.

### Howe's Cooperation

Howe's cooperation contributed significantly to the Government's successful prosecution of Joseph Percoco, Alain Kaloyeros, CPV executive Braith Kelly, COR executives Steven Aiello and Joseph Gerardi and LPCiminelli executive Louis Ciminelli.  Howe testified over the course of seven days at the trial of Percoco, Kelly, Aiello and Gerardi.  Howe provided the jury with a detailed, insider's view of the Percoco Bribery Scheme.  Howe's testimony was compelling and corroborated by documentary evidence, and he consistently took responsibility for his own extensive misconduct, both related and unrelated to the charged offenses.

However, as described in more detail below, Howe conceded during cross-examination that, subsequent to signing his cooperation agreement, he attempted to obtain a refund for certain travel expenses by stating he had not made a trip to New York when, in fact, he had been in New York proffering with the Government in furtherance of obtaining a cooperation agreement.  On the basis of this cross-examination, there existed probable cause to believe that Howe committed a crime while on pretrial release.  As a result, the Government took the unusual step of seeking his remand in the middle of his trial testimony, a fact that was revealed to the jury during Howe's continued cross-examination, and undoubtedly impacted the jury's view of him.  Howe remained

incarcerated for approximately six months.  As explained below, at least in part as a result of this episode, the Government did not to call Howe as a witness at the subsequent trial of Kaloyeros, Ciminelli, Aiello and Gerardi.

After the first trial, Percoco was convicted of conspiracy to commit honest services fraud and bribery in connection with the CPV part of the scheme, and Aiello and Percoco were both convicted of conspiracy to commit honest services fraud in connection with the COR Development part of the scheme.  The jury was deadlocked as to Kelly; he pleaded guilty to conspiracy to commit wire fraud shortly after trial.  The jury acquitted Gerardi.

## I.      Howe's Initial Cooperation, Guilty Plea and Trial Preparation

Howe cooperated with the Government prior to any formal charges against him, when the Government's investigation was significantly advanced, but not yet complete.  Although he initially denied his embezzlement from WOH, through an attorney proffer to the Government, he admitted his conduct shortly thereafter and began meeting with the Government in June 2016.  (Tr. 2104).  During eight proffer sessions prior to signing a cooperation agreement, Howe spoke about dozens of topics, and reviewed hundreds of documents with the Government, helping the Government confirm the chronology of relevant events and better understand the relationships among the co-conspirators.   For example, Howe helped the Government understand the relationship between Steven Aiello, Jr. and Andrew Ball, and Percoco's intervention in a dispute between them, leading the Government to call Ball to testify at the first trial.  Howe also gave the Government consent to search an iCloud account to which the Government did not previously have access.  In connection with his cooperation, Howe also admitted to a significant history of fraud, including conduct about which the Government was not aware and for which he had not previously been charged.

Howe pleaded guilty on September 20, 2016, two days before the arrests of the remaining defendants.  Howe remained available to the Government during the discovery and pretrial litigation phases of the case, and provided information as needed during that time.

In or about late 2017, the Government began meeting with Howe regularly to prepare for the first trial.  Those meetings typically lasted for multiple hours and involved the detailed review of large binders of documents.  The Government met with Howe approximately 25 times in preparation for trial, during which he reviewed (and re-reviewed) the facts of each scheme, describing hundreds of documents and dozens of events in detail.  Howe also continued to review his extensive history of fraud with the Government.

## II.     Howe's Trial Testimony

Howe testified extensively during the first trial.  Although the Government's case was primarily based on documentary evidence, including emails, phone records and bank statements, there is no question that Howe's testimony was important, in particular in providing the jury an inside look at several key meetings between the defendants during which they formalized the relevant *quid pro quo* agreements.  Howe also testified about his own embezzlement and tax evasion, his 2010 conviction for check fraud, and several instances in which he failed to pay for

goods and services he used, failed to pay people who worked for him to and failed to repay those from whom he had borrowed money.  (*See, e.g.,* Tr. 2088-89, 2103-08, 2165, 2179, 3038-69).

With regard to the conduct of his co-conspirators, Howe's most helpful testimony is summarized below:

- Howe testified about Percoco's precarious financial situation in 2012, at the start of the CPV bribery scheme and in 2014, when Percoco engaged in the COR Development scheme, both of which Percoco contested at trial.  (Tr. 2093, 2298, 2307, 2315).

- Howe testified extensively about his conversations with Percoco and Kelly, together and separately, to arrange the bribe payments, providing context for important emails, such as when Howe wrote to Kelly of the "need to hammer something out for jp" and that Percoco wanted to "stay removed" from the process (GX 47), and when Howe told Percoco to "do the right thing with Braith" (GX 21).[1]  (*See* Tr. 2214-16, 2239).

- Howe testified about critical meetings in the consummation of the *quid pro quo* relationship, at which only he, Kelly, Percoco, and in one instance, Percoco's wife, were present, including (i) a September 2012 meeting at a restaurant in Danbury, Connecticut where the bribery agreement was finalized; and (ii) Kelly's only meeting with Percoco's wife, at a dinner at the Percocos' house in Westchester, New York, after Kelly had agreed to hire her, but before she was officially hired.  (*See* Tr. 2239, 2242-46, 2257, 2293, 2304-06).

- Howe described, as corroborated by his own emails, how he repeatedly asked Percoco to intervene with State officials on CPV's behalf, and Percoco agreed to do so. (*See* GX 82, 85; Tr. 2139-41, 2340-41).  In one email, Percoco explicitly agreed to "push on" State Operations Director Howard Glaser to support a power contract for CPV.  (GX 85.).  Again, Howe provided the jury context to understand the import of this email.  (Tr. 2341, 2361-63).

- Howe testified about Percoco's role influencing the signing of the interstate reciprocity agreement related to CPV's construction of a New Jersey power plant, explaining—contrary to the defense's contention—that Percoco used his influence to cause others to act.  (Tr. 2324-30, 2333-39).

---

[1] Howe altered certain emails when forwarding them to others, including the defendants against whom he testified.  He did so for a variety of reasons, including to make himself look more influential, to make it appear that he had accomplished more for his clients than he actually had, and to remove derogatory references about certain people.  Howe admitted this conduct prior to signing his cooperation agreement, and testified on direct examination, and on cross-examination, about the alterations he made to emails relevant to this case.  (*See* Tr. 2227, 2302-03, 2358, 2664-74).

- With regard to the COR Development part of the scheme, Howe described meetings arranging the bribe payments at which only he, Aiello and Gerardi were present. (*See* Tr. 2096-98, 2476).

- Howe provided context for emails evidencing the scheme, including one where Aiello told Howe he needed "Joe P." to "help on [the LPA]" (GX 551), and another in which the co-conspirators laughed when a State employee other than Percoco claimed credit for the reversal of the LPA decision (GX 586).  (Tr. 2475, 2522-26).

- Howe explained Percoco's influence over various officials who unwittingly facilitated the COR Development part of the scheme, including Percoco's influence even when he did not hold his official State title. (*See* Tr. 2098, 2101, 2539-40).

- Howe described the relationship among Aiello, his son and Percoco, and reviewed key emails containing Aiello's requests, through Howe, to obtain a raise for his son from Percoco. (Tr. 2526-32).

- Howe explained the genesis of the word "ziti," which Percoco and Howe used as a thinly veiled reference to bribe payments.  (Tr. 2102).

Although Howe's prior statements to the Government about the Buffalo Billion Scheme were helpful in solidifying the Government's case regarding the bid-rigging scheme at the time it was charged in 2016, in light of the complications with Howe's testimony at the first trial (discussed in more detail below), and because defendant Kevin Schuler agreed to cooperate prior to the second trial, the Government chose not to call Howe as a witness during the Buffalo Billion trial.

## III.    Howe's Remand

As set forth above, Howe's testimony assisted the Government in securing convictions against Percoco and Aiello at the first trial, and likely influenced Kelly's decision to plead guilty rather than be tried again.  But Howe's testimony was not without incident.  During Howe's cross-examination at the end of the trial day on February 8, 2018, Howe was confronted with a prior attempt to obtain reimbursement for a hotel stay and related train fare.  The relevant testimony is below:

BY MR. GITNER:
Q.  Having read that, does that remind you that what you did was you called your credit card company, you asked Capital One, your credit card company, to credit your account, and you told them that you had not made these trips to New York to see these people, these prosecutors, and you had not stayed at the Waldorf when, in fact, you had; correct?

A.  The Waldorf one, yes.

Q.  And you did that on October 28, 2016?

A.  I believe so, yes.

Q.  And that was after you signed the cooperation agreement; right?

A.  Yes.

(Tr. 3113).

During this testimony, Howe conceded that he sought reimbursement for a train trip to New York City, and a corresponding hotel stay at the Waldorf Astoria, by telling his credit card company he had not made the trip, when he had in fact been meeting with the Government in New York during the relevant dates.  (Howe Proffer Agreement, 3512-07).  As a result, following Howe's February 8, 2018 testimony, the Government sought his remand, and he was incarcerated. At a presentment the following day, Howe consented to remand.

During continued cross-examination on February 13, 2018, Howe stated he may have been confused about the dates of various New York trips when he sought reimbursement from his credit card company in October 2016, for the June 2016 charges.  (Tr. 3213-16).  Howe remained detained during the remainder of his trial testimony, and through August 2, 2018, when he was released pursuant to several detailed bail conditions.[2]  (PSR ¶ 21).

Based on additional investigation pursuant to the Court's August 3, 2018 Order (Docket No. 57), and in particular on review of relevant credit card records, the Government has determined that although the credit card company initially removed the charges Howe challenged, it ultimately did not reimburse Howe for these charges because he did not respond to their request for back-up documentation and/or a formal statement.  Howe did not provide any affidavit in connection with the disputed charges.  Furthermore, according to Howe's counsel, Howe maintains that he did not intentionally mislead his credit card company but was confused about the date(s) on which he canceled trips when he sought reimbursement in October 2016 for the June 2016 trip.

Howe's decision to challenge certain credit card charges was, at minimum, reckless, and negatively impacted his testimony by significantly distracting from the critical issues of proof in a

---

[2] Howe's bail conditions include: A $100,000 personal recognizance bond signed by Howe's wife; travel restricted to Idaho and SDNY, including districts that must be crossed to arrive in SDNY, absent permission of the Court; the defendant is precluded from communication regarding the case with co-defendants, witnesses, victims or others with direct knowledge of or interactions related to the matters at issue in *U.S. v. Percoco* and *U.S. v. Kaloyeros*; the defendant is permitted to communicate with such individuals regarding letters of support for sentencing only with direct involvement of his attorney; the defendant must keep all records of cellphone use and other electronic communications; the defendant must submit his credit reports from all three major credit reporting bureaus by August 10, 2018 and again one week before sentencing to the Government and to the Court; all of the conditions contained in paragraphs 1-8 in Howe's July 25, 2018 letter (the "July 25 Letter") to the Court (Docket No. 52); and paragraph 13 from July 25 Letter restricting Howe's access to money and ability to spend money, except that it was modified to restrict Howe and his wife from any purchase of more than $1,000, except for rent and emergency expenditures, without permission of the Court.  (Docket No. 56).

complex bribery, honest services fraud, and extortion case in which Howe's testimony was otherwise credible and extensively corroborated. It also, as described above, substantially impacted the Government's presentation of evidence at the second trial.

### Assessment of the Defendant's Cooperation

Despite the detriment to the Government's case caused by Howe challenging certain credit card charges, and in spite of Howe's additional misguided decision to spend money that the Government had permitted him to set aside for tax purposes, Howe was nonetheless a productive and helpful cooperating witness in an important public corruption case that sent a powerful deterrent message. Howe met with the Government more than 30 times—occasionally by phone but often in person and typically for multiple hours at a time—and he always made his best efforts to provide assistance to the Government. Most importantly, he was forthcoming on a range of topics, both about his own extensive misconduct and about the misconduct of others, and his testimony on those matters was consistent with and corroborated by other witnesses and incontrovertible documentary evidence. His cooperation contributed significantly to the Government's successful prosecution of bribery of two public officials at the highest levels of State government and the five businessmen who bribed and engaged in fraud with them. And he testified at a highly-publicized trial that resulted not only in the conviction of a high-level State official, but also in an important ongoing public discourse about corruption in New York.

### Analysis of Section 5K1.1 Factors

1. "[S]ignificance and usefulness" of assistance (5K1.1(a)(1))

Howe's cooperation was both significant and useful. As discussed above, he was an important witness at the first trial, which resulted in the convictions of Percoco and Aiello and may have impacted the decision by Kelly to plead guilty. Howe also provided useful insight into the Buffalo Billion Scheme that assisted the Government in charging that scheme, and helped streamline the Government's review of the voluminous record related to that scheme. Notwithstanding the events that led to Howe's remand, which merit consideration by the Court, the significance and usefulness of his cooperation should be measured in proportion to the significance and impact of the prosecution which he furthered through extensive cooperation with the Government. In that regard, his cooperation was highly significant and useful.

2. "[T]ruthfulness, completeness, and reliability" of information and testimony (5K1.1(a)(2))

Howe unquestionably provided truthful, complete, and reliable information regarding the Percoco Bribery Scheme and the Buffalo Billion Scheme during his cooperation. He answered questions honestly, both during meetings with the Government and during direct and cross-examination. There can be little question too that Howe provided truthful, complete, and reliable information regarding his own crimes and transgressions, including crimes of which the Government had previously been unaware, taking responsibility for wrongdoing ranging from diverting funds from his firm to refusing to pay gardeners. With respect to the challenged credit card bills brought out on cross-examination, as noted above, Howe admitted that he erroneously

challenged the charges, but maintains that he did not intentionally lie to the credit card company. Those actions, intentional or otherwise, did incur the immediate consequence of remand and more than six months in prison. It remains the case, despite this incident and a long history of fraud and misconduct, that Howe provided extensive, truthful, and corroborated information and testimony regarding the charged crimes and many others.

3. "[N]ature and extent" of assistance (5K1.1(a)(3))

Howe's cooperation was undoubtedly extensive. He met or spoke with the Government more than 30 times, usually for hours at a time. He walked the Government through hundreds, if not thousands, of documents, oftentimes going over the same documents repeatedly to ensure the Government fully understood the complex chronology of events. He testified over the course of seven days at trial, including five days of intense cross-examination.

4. "[A]ny injury suffered, or any danger or risk of injury to the defendant or his family" resulting from assistance (5K1.1(a)(4))

As Your Honor is aware, it is inherently risky for a criminal defendant to cooperate with the Government, particularly where he was involved in a high-profile scheme, with powerful co-conspirators. Although the Government is unaware of any physical danger to Howe or his family, the intense public scrutiny surrounding the case was one of the reasons Howe left his longtime home in Washington D.C., and relocated to Idaho, where he remains.

5. "[T]imeliness" of assistance (5K1.1(a)(5))

Howe's cooperation was timely. Although his cooperation began toward the end of the Government's investigation, he proffered extensively prior to being charged himself (indeed, prior to charges being brought against anyone), at a time when his knowledge of the schemes remained of significant use to the Government's ongoing investigation.

## Restitution, Forfeiture and Repayment to the IRS

Pursuant to his cooperation agreement, Howe has agreed to pay restitution in the amount of $1,706,542 to WOH and to forfeiture of $2,835,000. A proposed restitution order is attached as Exhibit A. The Government will submit a consent order of forfeiture in advance of sentencing.

In connection with sentencing, the Government also requests that Howe be ordered to continue to comply with his tax payment plan with the IRS as a condition of any supervised release imposed by the Court.

### Conclusion

In light of the foregoing, the Government respectfully submits that Howe's assistance was "significan[t] and useful[]" to the Government in its investigation and prosecution of major bribery and bid-rigging schemes.  *See* U.S.S.G. § 5K1.1(a)(1).  The Government also believes that the information provided by Howe was "truthful[], complete[], and reliab[le]."  *See id.* § 5K1.1(a)(2). Accordingly, assuming that Howe complies with the terms of his cooperation, and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines and Section 3553(e) of Title 18, United States Code, that the Court sentence Howe in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney


By: /s/ Janis Echenberg
    Janis Echenberg
    Robert Boone
    David Zhou
    Matthew Podolsky
    Assistant United States Attorneys
    (212) 637-2597


cc (by ECF):   Richard Morvillo, Esq.
               Savannah Stevenson, Esq.