UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    - v –                               1:16-CR-00632 (VEC)

TODD HOWE,

                Defendant.

**<u>SENTENCING MEMORANDUM ON BEHALF OF TODD HOWE</u>**

ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10110
Telephone: (212) 506-3704

*Attorneys for Defendant Todd Howe*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

PERSONAL AND PROCEDURAL HISTORY .................................................... 4

    I.    Todd Howe's Personal History and Character...................................... 4

        A.    Todd's Childhood and Education ............................................. 4

        B.    Todd's Early Adulthood and Professional History.................... 6

        C.    Todd's Family and Friends Best Know His True Nature .......... 8

                1.    Todd's Siblings ............................................................ 9

                2.    Todd's Wife and Children ........................................... 11

                3.    Todd's Friends and the Broader Community.............. 14

    II.    Todd Howe's Offense Conduct and Case History ............................. 15

        A.    The Offense Conduct ............................................................. 16

                1.    The Percoco Scheme.................................................. 16

                2.    The Buffalo Billion Scheme ....................................... 17

                3.    The WOH and IRS Schemes and Other Fraudulent Conduct...... 18

        B.    Todd's Cooperation With the Government............................. 20

                1.    Todd's Substantial and Helpful Assistance ................ 20

                2.    Todd's Remand ........................................................... 22

        C.    Todd's Efforts to Build a New Life ........................................ 24

SENTENCING ANALYSIS................................................................................... 28

    I.    The Presentence Investigation Report Recommends a Sentence of Time Served ........................................................................................... 28

    II.    The Purposes of Sentencing Are Served by a Sentence of Time Served............ 29

        A.    The Sentencing Guidelines Calculation.................................. 30

        B.    Todd's Acceptance of Responsibility and Substantial Cooperation........ 30

        C.    Todd's Personal Characteristics Warrant Leniency................. 32

        D.    The Need for Just Punishment and Adequate Deterrence Has Been Satisfied.......... 36

        E.    Restitution, Forfeiture, and IRS Payments ............................. 38

CONCLUSION....................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Koon v. United States*,
    518 U.S. 81 (1996) ................................................................................................28

*Pepper v. United States*,
    131 S.Ct. 1229 (2011) ..........................................................................................28

*Rita v. United States*,
    551 U.S. 338 (2007) ........................................................................................29, 31

*United States v. Adelson*,
    441 F.Supp.2d 506 (S.D.N.Y. 2006) ..............................................30, 32, 35, 37

*United States v. Blake*,
    89 F. Supp. 2d 328 (E.D.N.Y. 2000) ...................................................................31

*United States v. Booker*,
    543 U.S. 220 (2005) ..............................................................................................28

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008) ................................................................................28

*United States v. Cunavelis*,
    969 F.2d 1419 (2d Cir. 1992) ..............................................................................31

*United States v. Douglas*,
    713 F.3d 694 (2d Cir. 2013) ................................................................................31

*United States v. Gaind*,
    829 F. Supp. 669 (S.D.N.Y. 1993) ......................................................................36

*United States v. Gerardi*,
    16-CR-776 (VEC), Dec. 6, 2018 .........................................................................20

*United States v. Jones*,
    531 F.3d 163 (2d Cir. 2008) ................................................................................29

*United States v. Mehta*,
    307 F.Supp.2d 270 (D. Mass 2004) ...............................................................33, 34

*United States v. Pauley*,
    511 F.3d 468 (4th Cir. 2007) ...............................................................................38

*United States v. Serafini*,
    233 F.3d 758 (3d. Cir. 2000) ..........................................................................33, 34

*United States v. Stewart*,
    590 F.3d 93 (2d Cir. 2009) ...................................................................................29

*United States v. Whitman*,
    12-cr-125 (S.D.N.Y.), Jan. 24, 2013 ...............................................................33, 34

*United States v. Yeaman*,
    248 F.3d 223 (3d Cir. 2001) .................................................................................37

**Statutes**

18 U.S.C. § 3553(a) .................................................................................26, 27, 28, 31

18 U.S.C. § 3553(a)(2) ..........................................................................................36

18 U.S.C. § 3553(a)(2)(B)-(C)..............................................................................34

U.S.S.G. § 5K1.1 ..............................................................................................29, 30

*"Robert Frost famously penned 'Two roads diverged in a yellow wood, and I chose the one less traveled by and that has made all the difference.'  This reminds us that we are all confronted with, and defined by, the choices we make.  I'm convinced that Todd is completely aware that the recent 'road' he chose was incorrect but that the choice was his, and takes ownership of that fact . . . I believe with love and support from his family, friends, and his new community, the future roads that Todd must choose will be much clearer for him.  I have faith knowing that when Todd chooses the correct road that it will lead to a positive difference in all the lives that he affects."*

*- Letter of T. Conroy.*

## PRELIMINARY STATEMENT

True to the century-old idiom, Todd Howe has his work cut out for him.  Todd stands before the Court having admitted to extensive fraudulent conduct and significant breaches of public trust.  But the Government, the IRS, the victims, and Todd's family have laid out the work Todd needs to do to make amends for his actions and reform his life.  This Court holds the final piece of the pattern that will allow Todd to stitch together a law-abiding and purposeful future: leniency at sentencing.

In the time since his initial surrender and guilty plea, Todd has worked steadily toward atonement by providing substantial assistance to the Government, working toward the obligations set out for him by the Government and the IRS, and simplifying his daily life in a manner that shuns former conduct and temptations in favor of honest hard work.  Todd's actions are significant in every respect and, consistent with the recommendation of the Probation Office, they warrant a sentence of time served.

First, Todd has repeatedly acknowledged his criminal conduct and taken responsibility for his actions and their attendant consequences.  He cooperated with the Government in an effort to begin making reparations for his crimes. Todd's early cooperation assisted in the charging and arrests of seven individuals.  He testified for seven days at trial and helped obtain

- 1 -

the convictions of two defendants, and likely the subsequent guilty plea of a third defendant. Todd's early assistance was also valuable in laying the roadmap for the successive convictions and guilty plea of the remaining four defendants as well.

Second, Todd has engaged in a course of self-reflection aimed at identifying and understanding what drove his wrongful actions to gird himself against future temptations and ensure he does not make similar mistakes again.  Through work with a therapist, his time incarcerated at the Metropolitan Correction Center ("MCC"), and intense self-reflection over the past three years, Todd understands that his life-long history of wanting to say "yes" and get the job done for family, friends, and colleagues spiraled out of control into compulsive spending, crippling debt, and, eventually, to his dishonest and fraudulent conduct.  Todd has continued to engage in periodic counseling to understand how to deal with certain triggers that contributed to his willingness to commit such serious, wrongful acts.

Third, Todd has begun a new life far removed from the politics and pressures of Washington, DC, New York, and the snaking vines of the lobbying network.  Todd and his wife, Sarah, relocated to Ketchum, Idaho, where their simpler life centers around the beauty of the surrounding mountains and peaceful time spent together.  Todd is now employed full-time as a groundskeeper for a seasonal ski and golf resort in Sun Valley.  Todd's return to a job involving physical labor achieves the dual purpose of keeping him far removed from the politicking of traditional white-collar jobs, and grounding Todd in the teachings of his formative years spent working in his father's factory.  Todd knows and accepts that he will never return to the east coast and to political work, and he is at peace with his new reality.

Finally, as the Court knows, Todd spent six months incarcerated at the MCC in connection with his trial testimony that led to his remand.  During his period of incarceration at a particularly harsh facility, Todd had no choice but to truly confront the severity of his crimes and the reality of the consequences.  He engaged in deep self-reflection.  He spent his time at the

MCC assisting other inmates with writing letters, preparing for sentencing, and any other task with which he was equipped to assist.  After the Court saw fit to release Todd in August 2018, Todd has met and exceeded his obligations and the expectations of the Court and society.  His success demonstrates that a further period of incarceration is unnecessary to punish or deter him.

In light of Todd's cooperation, his prior incarceration, and the success he has had thus far in reforming his life, an additional term of incarceration would be greater than necessary to achieve a just sentence.  Todd has already begun the substantial work required to right his wrongs and make meaningful changes for the betterment of himself, his family and his community.  The totality of his circumstances warrants a sentence of time served.

## PERSONAL AND PROCEDURAL HISTORY

I.   **Todd Howe's Personal History and Character**

  A. **Todd's Childhood and Education**

Todd Howe was born in May of 1960 and raised in the hamlet of Cropseyville, New York, about 10 miles outside the manufacturing town of Troy.  Todd and his three siblings grew up on a sprawling farm that afforded them space for roaming adventures in the surrounding fields.  At the time, Todd had two sisters who were considerably older—his sister Pamela is 11 years his senior, and his sister Victoria, who was six years older.  Todd is the third Howe child, and he always kept a watchful eye on his younger sister, Sally, who is eight years his junior.

Todd's parents, John and Marjorie, raised a family plucked out of a Norman Rockwell painting set in the "rolling hills of Rensselaer County" with "dogs, cats, rabbits, ponies" and "pets galore."  P. Brown Ltr. Ex. C at 1.  John Howe ran a manufacturing company known as "Howe Brothers, Inc." that produced body parts for commercial trucks and employed hundreds of people in the Troy area.  Marjorie was an elementary school teacher who taught everyone "to love reading."  *Id*.

The Howes nurtured their children to work hard, play sports, mind their Episcopalian faith, and contribute to their community.  They worked hard to ensure that each of their children attended a reputable school, participated in athletics and arts, and understood that a world full of possibilities existed for them when they were ready.

Todd acknowledges that he received certain special treatment as the only boy in the household.  While his three sisters lovingly ganged up on him, his parents allowed him more freedom and pushed him harder to succeed in the traditional sense of financial and career objectives.  But as the only boy on an isolated farm, Todd often felt alone.  Understandably, Todd was his "father's shadow," sticking "by his side as much as he could . . . going to work

with him, mowing the lawn with him . . . absorbing his positive can-do attitude, his joie de vivre, his strong work ethic and his respect for all humankind."  P. Brown Ltr., Ex. C at 1.

John Howe was a quintessential American manufacturing businessman who prided himself in the whirring and puffing of his factory, and prided himself more in taking his son to work.  But John Howe never paraded Todd around his factory as the boss's son—Todd always understood that he was there to work.  Alongside the other employees, Todd swept floors, cleaned restrooms, painted dilapidated buildings, and chipped in wherever he could.  A strong work ethic was his father's expectation, and Todd never failed to meet it.  This eagerness to please would become a lifelong characteristic of Todd's, to his advantage and to his detriment.

Todd's attachment to his father made it all the more painful when John Howe died of pancreatic cancer at age 52, when Todd was just 16.  John's death "was a blow from which [the] family never recovered emotionally."  *Id*.  Todd's grief over his father's death manifested in an overwhelming desire to fill his father's shoes.  Todd became the person who held the family together: he consoled his mother; he comforted his older sisters; he made all of the funeral and burial arrangements; he assumed responsibility for the family finances and administration; he became a father figure to his younger sister, who was only eight at the time and still considers Todd "her hero."  Sally Howe Ltr., Ex. D at 1.

After his father's death, Todd continued to work at the Howe Brothers factory through the remainder of high school and during the summers in college.  Howe Brothers had been a family business since 1919, but without his father there Todd had no desire to continue with it—though the company still exists to this day.

Todd attended Hartwick College in Oneonta, New York so that he was only about an hour's drive from his family.  Todd matriculated through Hartwick College as a student athlete, playing soccer and lacrosse, and achieving decent grades.

Todd's college career was somewhat average and enjoyable, but one of his defining life moments came only two weeks into his freshman year.  Early one evening at a local college bar, Todd met Sarah Hazen, the woman who became his wife and still stands with him today.

### B.  Todd's Early Adulthood and Professional History

Immediately after college, Todd sought a job in government service.  Todd had always known that he would not pursue the Howe Brothers family business without his father there, or any manufacturing business for that matter.  Todd believed that he could best fulfill his father's mandate to work hard and serve others by entering public service.  As Todd's sister recalls, Todd "reveled in public service—a welcome surprise to me coming from generations of entrepreneurs." P. Brown Ltr., Ex. C at 2.

Todd and Sarah moved to Albany, New York, and Todd took a job in the Constituent Services office for then-Senator Tarky Lombardi, Jr., a Republican member of the New York State Senate.  For two years, Todd was on the front lines of assisting district constituents with every need they brought to the political level, from affordable housing issues to employment policies that impacted the changing Albany region.

During that time, the New York State government transitioned from the final years of Governor Hugh Carey's tenure to the first term of Governor Mario Cuomo in 1983.  Todd's college friend and roommate in Albany worked in the Governor's office and had seen how hard Todd worked for his constituents over the past two years.  His roommate "introduced [Todd] to colleagues [in the Governor's office] and he made such a positive impression on them that they

quickly hired him despite the fact that the Senator he was working for was from a different political party."  C. Walsh Ltr., Ex. L at 1.

For the next eight years, Todd worked directly with Governor Mario Cuomo as his Director of Scheduling and Confidential Assistant.  He quickly gained the trust of the Governor. These years of early adulthood were formative for Todd.  His family members observed that "he showed pride in his role in public service," and that the Governor became a father-figure for Todd, "help[ing] shape the strong work ethic, integrity and desire to give back to the community that Todd has shown us in much of his career."  S. Morvillo Ltr., Ex. G at 1.

Todd thrived in his role in the Governor's office, and he thrived personally.  During his early years in Albany, Todd and Sarah married and welcomed their first child—a daughter named Hannah—in 1989.  As a new parents, Todd and Sarah struggled with balancing family life and their modest incomes from Todd's government job and Sarah's nonprofit position.  But the burgeoning family lived in small apartments around the Albany area and were happy and content with their then-simple lives.

Leading up to the birth of the Howe's second child, Todd began to realize that he needed to earn more money.  He accepted a position covering Government Affairs at his sister's public relations firm in Albany.  After two short years, and on the heels of the birth of his son, Elliot, Todd relocated his family to Washington, D.C. to serve as Special Deputy to then-Labor Secretary Robert Reich in the Clinton Administration.

Todd served three years under Secretary Reich before moving on to serve another Cuomo: Todd worked as the Deputy Chief of Staff for Operations for the Department of Housing and Urban Development ("HUD") under then-HUD Secretary (and now New York Governor) Andrew Cuomo.  Todd's primary job was to run the day-to-day operations of the Department and manage

the regional HUD field offices.  This role included significant interfacing with White House staff and senior officials.

When George W. Bush was sworn into office in 2000, Todd was replaced in a sweep by the incoming Republican administration.  He went to work in the private sector as the Senior Vice President for Corporate Relations at the Mortgage Bankers Association ("MBA")—an entity he worked with while employed with HUD.  Todd was tasked with interfacing with the chief executives of major mortgage corporations across the country.

After a few years, Todd was dismissed from the MBA for misconduct related to travel expenses.  *See* Trial Tr. at 2122-23.[1]  In the fall of 2002, Todd took the fateful step of accepting a job as the President of Government Solutions for a lobbying subsidiary of the Albany law firm Whiteman, Osterman & Hanna LLP ("WOH").  In connection with this job, Todd opened WOH's first office in Washington, D.C.

Todd initially desired to build bridges between service-oriented organizations and the federal funding they critically needed.  And much of Todd's early work achieved precisely that objective.  But in the fourteen years that Todd worked for WOH, he developed what was essentially a double life, using his position both for good and for the unlawful benefit of himself and his long-time associates from his days in the Cuomo administration.  This criminal conduct, discussed in further detail below, now brings Todd before the Court for sentencing.

**C.  Todd's Family and Friends Best Know His True Nature**

From the moment Todd was implicated in the sprawling investigations related to Joseph Percoco and the Buffalo Billion initiative, he received unwavering support and guidance from his

---

[1]  All citations to Trial Transcript herein refer to the transcript of the January 2018 trial in *United States v. Percoco, et al.*, S2 16-CR-776 (VEC).

family.  Reconciling the man they know Todd to be with the secretive unlawful conduct of his "double life" has been at times unbearably difficult, but his family stands by him.

The response of Todd's family is not surprising considering the close, caring family from which Todd comes, and the reciprocal loyalty, care and support that Todd has shown throughout his life.  As Todd's family describes him, Todd is "extremely hardworking, loyal, generous, respectful, humble, private and kind."  S. Howe Ltr., Ex. B at 1.  "[W]hile Todd inherited many of the traits of our mother and father . . . the ones that I witnessed day in and day out were his kindness and his love of family."  P. Brown Ltr., Ex. C at 1.  Todd's family remains firm in their collective belief that these traits, together with their help, will allow Todd to rebuild his life in a positive manner.

### 1. **Todd's Siblings**

Todd has always been exceptionally close to his siblings.  This closeness resulted from their parents' emphasis on family, but also from the premature death of their father which caused the siblings to bond around their mother and each other, with Todd at the center.

In the years immediately after their father's passing, Todd's older sisters looked to him for emotional support.  But his younger sister, Sally, who was only eight when their father died, describes the lengths to which Todd went to try to fill his father's role in her life.  "Todd took me to hockey games, movies, drove me to swim practice every morning in the summer at 5:30am . . . [he] also taught me to drive, ski, and play soccer."  Sally Howe Ltr., Ex. D at 1.  Sally also credits Todd with her rescue from a teenage "downward spiral."  *Id*.  Sally's letter describes the time and research Todd put into an interventive decision to send her to an Outward Bound program, which are notoriously tough and demanding.  As a father would have done, Todd "sat me down and explained that this was not a punishment but a really great opportunity . . . [n]ine months later I

received a letter from the Hurricane Island Outward Bound School asking if I would come back and be an instructor . . .." *Id*.

The paternal love and devotion Todd showed to his younger sister in her developmental years set the stage for the role Todd played in each of his sisters' lives as they moved through adulthood. One winter evening in the swirl of an Albany snowstorm, Todd "sensed" that something was "terribly wrong" with his sister Victoria's pregnancy.  P. Brown Ltr., Ex. C at 2. Todd drove to her home and rushed her to the hospital, where Victoria's son was saved in childbirth.  Eight years later, when Todd was 33, Sally was 25, and Pamela was 44, their middle sister Victoria was again struck by tragedy.  She was diagnosed with breast cancer and died shortly thereafter at the age of 42, leaving her husband and two young children behind.  Todd's living sisters, Sally and Pamela, observed that "Todd was one of [Victoria's] biggest advocates when she was hospitalized."  Sally Howe Ltr., Ex. D at 1.  At the end of Victoria's life, "[i]t was Todd who sat with her in the hospital on the night before she died . . . and then returned to sit by Victoria's side and listen to her last wishes."  P. Brown Ltr., Ex. C at 2.  Todd later sat with Victoria's husband on lawn-chairs outside the crematorium for the better part of fifteen hours. Todd became the "rock" on which everyone rested their grief.  Sally Howe Ltr., Ex. D at 2.

Todd was similarly invaluable to his living siblings four years later when their mother passed away.  Again ten years later, Todd supported his sister Pamela when her husband unexpectedly died.  As Pamela remembers, Todd rushed to her side immediately and "spent hours and days with me helping me sort out my life, listening to me cry and offering his shoulder—and doing everything he could to buoy my flagged spirits."  P. Brown Ltr., Ex. C at 2.  And Todd has recently been his younger sister's "rock"—despite the turmoil in his own life—as her husband was just diagnosed with brain cancer.  Sally Howe Ltr., Ex. D at 2.

10

Todd's sisters equally acknowledge that Todd has been their champion and friend in good times and successes. But it is the moments of emotional upheaval that have truly bonded Todd's siblings together, and that provide the basis for his sisters' belief that Todd will overcome his regrettable and difficult circumstances and work "diligently to rebuild his life." P. Brown Ltr., Ex. C at 3; Sally Howe Ltr., Ex. D at 2.

### 2. Todd's Wife and Children

Todd's family, especially his children, has always been at the center of his life. *See, e.g.*, C. Lapetina Ltr., Ex. K at 1; S. Morvillo Ltr., Ex. G at 1. Many of the letters submitted on Todd's behalf note that he is "one of the most caring and dedicated fathers." A. Banadda Ltr. Ex. R. The "love [Todd] has for his children has always been evident" and he "consistently [has gone] above and beyond" for them. G. Davis Ltr., Ex. S at 1.

Todd grieves over the losses his family has suffered because of his conduct. ████████

████████████████████████████████████████████████████████████████

███████████████████████████████████; his wife Sarah had to give up a lengthy and successful career in non-profit media relations to support Todd's relocation and rehabilitation. Todd expresses his gratitude for his family:

> I am so thankful for the support of my remarkable wife—who I have been married to for nearly 35 years—my son and daughter, and other family members who have stood by my side with unconditional love. My family never once turned their backs on me over the past 3 years, despite the horrible decisions I made and the disappointment, confusion and embarrassment I caused them. They have suffered so many consequences because of my actions. But they never wavered in their support. It is my responsibility to step up and help provide for them now and make the very best of my changed circumstances.

T. Howe Ltr., Ex. A at 2.

Todd's family has had to grapple with Todd's deceitful and well-hidden conduct. Todd's wife, Sarah, describes him as "my husband, father of our 2 children and my best friend for 35

years."  S. Howe Ltr., Ex. B at 1.  But she acknowledges that "at least for some time, there were two sides to Todd."  *Id*.  Sarah explains:

> [Todd] had a reputation as someone who could get anything done . . . and I know from past conversations that his employers put pressure on him to deliver.  He handled the pressure better than anyone I have ever met and even seemed to thrive in that intense atmosphere. But it is clear to me now that Todd seemed to handle the pressure, at least on the surface, for the benefit of our family.  In reality, he was like a duck who swims smoothly along the water but is kicking for its life underneath the surface. In this way, Todd was able to go down this dark road of over-spending and then committing crimes to make up for it, all while making it seem like everything was fine to us . . . But I have to accept that he did these things and I know that together we can make sure he stays on the right path.

*Id*. at 2.

In order to cope with this trying time, Sarah and the Howe children have focused on what they consider to be Todd's true good nature, which they believe will win the day in light of all the changes Todd has made over the past several years.  Sarah focuses on Todd's strength as a father: "I am proud to say that together Todd and I have raised two hard working, empathetic and kind children—a testament in great part to Todd and his parenting skills. He encouraged us all to always do our very best and help others. The eternal optimist, he instilled in us the belief that anything is possible."  *Id*. at 1.

Sarah also notes that she and Todd were originally drawn to each other because of their mutual commitment to public service, and over the years Todd was able to do an incredible amount of good in the community.  *Id*. at 2-3 (noting Todd's work in securing funding for park refurbishment and programming for underprivileged children; forming a partnership to provide computers to children in underserved public schools; and securing funding for theater outreach to hundreds of schoolchildren).  She is confident that Todd will eventually be in a position to do good again.  *Id*.

Todd's children—Hannah, age 29 and Elliot, age 25—speak of their father as a "best friend" who went "above and beyond" in every aspect of fatherhood.  Like their mother, Hannah and Elliot express shock and dismay at the fact that their "dad could be so diligent about teaching us the value of hard work and honesty while he was not fully living those values himself."  H. Howe Ltr., Ex. E at 1.  But, also like their mother, Hannah and Elliot focus on all the good that their father brought to their lives.  Todd consistently taught Hannah and Elliot to "be a good teammate, a good person, and always help where needed above all else."  E. Howe Ltr., Ex. F at 1.

Hannah and Elliot provide numerous examples where Todd demonstrated to them the value of hard work and respect for others.  They both recall him opening their home to those need, whether it was Elliot's high school friend from Ghana who could not travel home in the summers or on holidays, or a friend who was just divorced and needed to be with a family.  H. Howe Ltr., Ex. E at 2 ("He took in one of his close friends on Thanksgiving who was going through a divorce.  My dad truly cares more about helping others than himself."); E. Howe Ltr., Ex. F at 1-2." ("My father never vocalized anything he did for people because that is just the man he is . . . I have tried to emulate his way of giving back to people whenever I can.").

Hannah has had the unique perspective of being the only family member residing in New York City who could visit Todd while he was incarcerated at the MCC.  She explains that Todd was injured by other inmates on two occasions and experienced the many other dreadful aspects of the MCC, yet she notes that "my dad remained positive and, surprisingly, the MCC taught him and our family that life is precious.  Even at MCC he tried to make the best of the situation.  He shared his food with inmates, made friends who I met when I visited, and he tried to help some of the younger inmates better cope with life there.  I'm proud to say that even while at the MCC my dad's character was evident and strong."  H. Howe Ltr., Ex. E at 2.

It is Todd's positivity and his generosity of spirit that reveal his true nature and that his family relies on in making their "commit[ment] to helping him along the way" toward rehabilitation.  S. Howe Ltr., Ex. B at 5.  They are proud of the new life Todd has begun and the resiliency and dedication toward change that he has shown.  As Hannah says, "In this way, he is still a positive example to me."  H. Howe Ltr., Ex. E at 2.

**3.**   **Todd's Friends and the Broader Community**

It is evident in the letters of support submitted on Todd's behalf that he is a dedicated friend.  Several of his long-time friends—some of more than thirty years—wrote letters of support that contain common themes.  Todd's friends describe him as "exceptionally helpful and kind to innumerable friends and associates."  T. Ryan Ltr., Ex. N at 1.  They note that Todd is "a strong family man," that he is "public-spirited," always "hard-working," and a "good and reliable friend."  Ltrs. of T. Conroy (Ex. M); S. Lundine (Ex. J); C. Walsh (Ex. L); B. Tessler (Ex. O).

For these reasons, Todd formerly enjoyed a large circle of friends from many walks of life. He has lost many, if not most of these friends in light of his criminal conduct and its public nature. It is counsel's understanding that there have been formal and informal efforts by politically-connected individuals to cause Todd's former friends and colleagues to sever ties with him in every respect, even personal support.  *See* S. Howe Ltr., Ex. B at 2; T. Ryan Ltr., Ex. N at 2.

Those of Todd's friends who have retired from or otherwise voluntarily left the political arena have offered their voices in support of Todd—not to condone or excuse his criminal conduct, but to inform the Court about Todd's whole person and to champion his ability to make amends and move his life forward in a positive and contributory fashion.  Todd's long-time friend Tom looks to Todd's "many positive qualities, including intelligence, a strong work ethic, helpfulness, and loyalty."  T. Ryan Ltr., Ex. N at 1.  Another friend remarks that "[o]ver these past

14

decades, I've had the privilege of serving with many great people . . . and among them, without hesitation, I would include Todd."  T. Conroy Ltr., Ex. M at 1.

Each of these friends acknowledges Todd's criminal conduct and accepts that Todd "brought himself down."  C. Walsh Ltr. , Ex. L at 2.  They acknowledge, as Todd does, that his "history of money problems" and "spending compulsion" were "overpowering" and that Todd created a cycle resulting in "unrelenting pressure to bring more income in."  C. Walsh Ltr., Ex. L at 2; *see also* S. Morvillo Ltr., Ex. G at 2; C. Lapetina Ltr., Ex. K at 1.

More importantly, however, the friends who have communicated with Todd have heard and witnessed his remorse, and are convinced that Todd's true nature—the way they all knew him to be—will allow him to successfully rebuild.  *See* C. Walsh Ltr., Ex. L at 2 ("Sometimes, for various reasons, good people do wrong. . . .Please consider making the amount of time [Todd may] spend in prison minimal so that he can work on making those he has hurt financially whole, and move forward on learning to understand and control his compulsion); *see also* T. Ryan Ltr., Ex. N at 2 ("I believe [Todd] is a very different person today that the one who repeatedly crossed the line between right and wrong . . . The man I know is much more than what's represented by his conduct here."); C. Lapetina Ltr., Ex. K at 2 ("I think Todd still can lead a positive and constructive life despite his crimes.").

## II.   Todd Howe's Offense Conduct and Case History

The criminal conduct in which Todd Howe participated involved three separate schemes: the Percoco scheme, the Buffalo Billion scheme, and Todd's own embezzlement and tax evasion scheme involving WOH and the IRS, among other extensive fraudulent conduct. The Government conducted a lengthy investigation into these schemes, which was covered extensively in the media in light of the public nature of the case.  On September 20, 2016,

Todd Howe surrendered and pled guilty to eight charges in connection with these schemes pursuant to a cooperation agreement.

## A.  The Offense Conduct

This Court presided over two lengthy trials in connection with the Percoco and Buffalo Billion schemes, which also covered Todd's personal frauds.  The Court is therefore intimately familiar with the nature of the three schemes and the fraudulent conduct that carried them to their unlawful objectives.  For that reason, the offense conduct is summarized as follows.

### 1.  <u>The Percoco Scheme</u>

Beginning in or around 2010, Todd Howe conspired with Joseph Percoco, Peter Galbraith "Braith" Kelly, Joseph Gerardi, and Steven Aiello to exchange bribes among persons and organizations with business operations involving the State of New York in exchange for Percoco's use of his substantial influence over New York State officials, or his own direct official action on behalf of those organizations and entities.  *See generally* Trial Tr. at 2087-88.

Todd facilitated payments for Percoco's influence by arranging for a "low-show" job for Percoco's wife at CPV—Braith Kelly's company that was seeking the benefits of Percoco's influence in connection with a multi-million dollar Emissions Credit Agreement involving the New York State Department of Energy Conservation and a long-term Power Purchase Agreement with New York State.  Todd also arranged with Steven Aiello and his company, COR, to offer an improper consultancy to Percoco after Percoco left the government but continued to work in Cuomo's campaign office (during which he retained influence over State officials), and after which he returned to work in the Cuomo administration.  *See generally* Trial Tr. at 2094-98.

Todd further arranged for Percoco to effect a pay raise for Steven Aiello's son in connection with his son's New York State government job; to help COR in avoiding costly labor union agreements; and to cause New York State to release certain funds in connection with two

16

COR development projects. *Id*. at 2099-2100. Throughout this scheme, Todd ran interference among all the interested parties to ensure that Percoco, CPV, COR, and others were furthering their illicit tasks so that everyone's objectives were met. *Id*. at 2101-02.

To hide the movement of bribes in the Percoco scheme, Todd established a secret limited liability corporation called Potomac Strategies. Todd funneled payments through Potomac Strategies to himself and to Percoco (through Percoco's wife) to conceal the payments from his employer and others, in part because external consulting arrangements were forbidden under Todd's employment agreement with WOH and because the coconspirators had discussed the need to keep Percoco's name far removed from the flow of any funds. *Id*. at 2097.

As a direct result of Todd's bribery orchestration and his facilitation of payments, CPV and COR achieved certain of the results these entities desired when seeking, securing, and paying for Percoco's government influence. The Government estimates, and Todd does not have a basis to dispute, that the estimated benefit associated with the Percoco scheme is approximately $1,559,893.50. *See* PSR ¶ 37.

### 2. The Buffalo Billion Scheme

At the same time he conspired with others to carry out the Percoco scheme, Todd Howe was directly involved in orchestrating the Buffalo Billion scheme. Specifically, Todd conspired with Alain Kaloyeros, Louis Ciminelli, Kevin Schuler, Steven Aiello, and Joseph Gerardi to rig the bidding process in connection with various construction-related projects undertaken by the State-funded College of Nanoscale Science and Engineering (now known as SUNY Poly). *See* PSR ¶ 38. Kaloyeros was the president of SUNY Poly and had direct influence over its board of directors and its subsidiary development corporation known as Fort Schuyler.

Todd's primary objective in carrying out this scheme was to fraudulently alter proposals and facilitate payments to ensure that his clients—clients of WOH—received the multi-million

dollar construction contracts without engaging in a fair, honest, and competitive bidding process. *Id*.

Todd accomplished this objective by working on behalf of SUNY Poly as a consultant through WOH, and then demanding and accepting significant bribes in his capacity as an agent of SUNY Poly in exchange for his influence in having SUNY Poly and its affiliate award construction work to those who paid him. Todd thus benefitted on all sides of the transactions. Todd and his coconspirators then ensured that the parties involved in the bidding process kept their conduct secret by requiring them to certify that no one influenced the procurement process. *Id*. ¶¶ 39-40.

The Government estimates that the total benefit associated with the Buffalo Billion scheme is approximately \$34,650,000.[2]  *See* PSR ¶ 44.

### 3.   The WOH and IRS Schemes and Other Fraudulent Conduct

Arguably the most egregious conduct as it relates to Todd Howe personally is the scheme he undertook of his own accord and without coconspirators to defraud his employer and the IRS. Starting as early as 2009, and in response to his increasingly precarious financial circumstances, Todd began to embezzle funds from WOH.

Specifically, Todd embezzled funds from his employer through two overarching schemes. First, Todd opened an account in WOH's name without WOH's knowledge or authorization, and then deposited hundreds of thousands of dollars of company checks into that account and then into another personal account for his own use.  *See* Trial Tr. at 20188. As part of this prong of his embezzlement scheme, Todd also received bonuses from clients and took on new clients without

---

[2]   Defense counsel understands that the Court previously rejected this calculation and determined that the loss amount in 2B1.1(b) does not apply.  *See United States v. Ciminelli*, 16-CR-776 (VEC), Dec. 3, 2018 Sentencing Tr. at 14-16; *United States v. Gerardi*, 16-CR-776 (VEC), Dec. 6, 2018 Sentencing Tr. at 11-12.

informing WOH, and deposited related funds into the secret WOH account.  Second, Todd orchestrated a scheme that allowed him to obtain double reimbursement for various travel expenses, or obtain reimbursement for travel expenses he never actually incurred.  *Id*.  The Government estimates, and Todd does not dispute, that Todd embezzled approximately $1,706,542 from WOH.  *See* PSR ¶ 45.

After embezzling from WOH, Todd failed to claim and pay taxes on any of the funds that he embezzled.  The IRS has assessed Todd's tax liability at approximately $714,027.  Todd has agreed to pay this amount over time and to file amended tax returns for 2010 through 2015.  PSR ¶ 47.  Todd made an initial payment of $190,000[3] toward his tax liability, and he has consistently made his $1,000 payment per month since May 2017.  He has also filed the required amended and current tax returns.

In addition to his schemes to defraud WOH and the IRS, Todd admitted to numerous other instances of fraud.  He admitted to deceiving his bank by depositing an envelope purporting to contain a $45,000 check and then lying about failing to place the check in the envelope.  *See* Trial Tr. at 2105-06.  In 2010, Todd entered a guilty plea in connection with this fraud.  *Id*.  Further, Todd admitted to committing a series of ongoing frauds or failures to make payment involving rental cars, car leases, hotels, other business expenditures, and personal vendors, including but not remotely limited to gardeners and loans from friends.  *Id*.; *see also* Trial Tr. at 2088-89, 2103-08, 2179; 3038-69.  There is no doubt that Todd was buried financially and that he turned to a life a fraudulent conduct to dig himself out.

---

[3]  As described below in relation to his cooperation, Todd agreed to set aside an additional sum to use to make payments on his tax liability; however, Todd spent that money on personal debts and expenditures.  *See* Section B.2 (Todd's Remand) *supra* at 21-22.

**B.  Todd's Cooperation With the Government**

Almost exactly three years ago, Todd's home and office were raided by FBI agents.
Todd initially denied his involvement in the schemes, and he lied about his role to his lawyer
and to the Government through an attorney proffer.  *See* Trial Tr. at 2104.  But after a
meaningful discussion with his counsel and family, Todd confronted his failures, his shame,
and his crimes.  *Id.*  He determined that the first step toward making amends for his wrongs
was to assist the Government.  *See* T. Howe Ltr., Ex. A at 2; S. Howe Ltr., Ex. B at 2.

**1.  Todd's Substantial and Helpful Assistance**

Todd's cooperation with the Government began in or around June of 2016.  Though the
Government had been investigating the Percoco and Buffalo Billion schemes for some time,
Todd was the first and only individual who cooperated in advance of the Government filing
charges in connection with these schemes.  Indeed, Todd met with the Government
approximately eight times—nearly once per week—over the summer months.  In those
meetings, Todd reviewed hundreds if not thousands of documents with the Government.  Todd
was uniquely positioned to explain the connection between certain correspondence and events;
the use of certain "code" employed by coconspirators; the timeline and development of the
Percoco and Buffalo Billion schemes; and the procedural workings of the New York State
government that underpinned the criminal nature of the conduct in question.

Todd further consented to the search of an iCloud account that provided a number of
documents that the Government had not previously recovered.  Moreover, Todd was able to
clarify the relationship between Steven Aiello, Jr. and Andrew Ball in connection with the
Percoco scheme, which led the Government to call Ball as a witness at trial.

Without question, Todd's pre-charging cooperation in the 2016 summer months assisted the Government in moving swiftly and confidently in charging seven corrupt high-level officials and prominent businessmen in September 2016.

Todd's cooperation with the Government over the next 15 months continued to be detailed and extensive.  Leading up to the January 2018 trial in connection with the Percoco scheme, Todd met with the government approximately 25 additional times, often for hours or full days at a time.  He again reviewed documents, correspondence, and timelines that were critical in solidifying the Government's proof and building its case for trial.

Finally, Todd testified for seven long days at trial in connection with the Percoco scheme.  His testimony was lengthy and detailed: he truly gave the jury a view into the inner workings of the corrupt Percoco scheme, particularly into the spoken exchanges that occurred in meetings which solidified the bribery agreements—evidence that could only come from Todd.  Todd also brought to life for the jury the many Government documents that corroborated his testimony.  He further confessed to his own deep level of criminal conduct, some of which had nothing to do with the charged schemes.

Ultimately, Todd's cooperation assisted in obtaining the convictions at trial of Percoco and Aiello.  It is likely that Todd's testimony contributed to Braith Kelly's subsequent decision to plead guilty.  While Todd did not testify at trial in connection with the Buffalo Billion scheme for reasons discussed below, it is undoubtedly true that his early cooperation assisted in the charging of those defendants—including the cooperating witness in that case—and helped provide a roadmap for the evidence presented at the Buffalo Billion trial.  The Court has also considered Todd's testimony in connection with the sentencings of the Buffalo Billion defendants.  *See*, *e.g.*, *United States v. Gerardi*, 16-CR-776 (VEC), Dec. 6, 2018 Sentencing Tr. at 10 (at Gerardi's sentencing, the Court concluded that "the credible testimony of Todd Howe"

21

presented at the January Percoco trial "is important evidence to consider when weighing the required sentencing factors.").

### 2.  Todd's Remand

As the Court is well aware, Todd's cooperation was not without issue, and Todd found himself in the precarious position of nearly losing credit for the substantial assistance he provided.  First, after entering into his cooperation agreement and striking an agreement to escrow funds from the sale of his house to make installment payments to the IRS, Todd failed to live up to that agreement.  Todd paid approximately $190,000 toward his tax liability, but broke his agreement by spending the remaining $80,000 on debts and other frivolous spending.  Trial Tr. at 2114-15.  However, Todd has consistently made his installment payments of $1,000 per month since May 2017, and has submitted all necessary amended and current tax returns.  To date, he has paid approximately $213,000 of his outstanding tax liability.

More detrimental to Todd's cooperation, however, was a dramatic and regrettable moment during his cross-examination by Braith Kelly's counsel.  Todd was confronted with the transcripts of calls he made on October 28, 2016 to his credit card provider, Capital One, wherein he disputed the charges for train tickets and a hotel stay at the Waldorf Astoria on June 21, 2016.  *See generally* Trial Tr. at 3107-3113.  Todd had indeed taken those trains and stayed at the Waldorf Astoria on that night because he was in fact in New York to meet with the Government.  *Id*.  Todd's charge dispute occurred approximately six weeks after he signed his cooperation agreement, wherein he agreed not to commit further crimes.  *Id*. at 3113-3114. Based on his testimony and the probable cause that Todd had violated his conditions of release, the Government took the extraordinary step of arresting and remanding Todd mid-testimony. Todd consented to remand.  *Id*. at 3112.

22

When Todd returned to take the stand after a long weekend at the MCC, he walked back his earlier testimony.  Todd explained that he had been confused about the dates of various trips to New York when he was meeting frequently with the Government and also tending to his daughter, who had undergone emergency surgery over Memorial Day weekend and a subsequent lengthy hospital stay.  *Id.* at 3213-3214.

Todd remained incarcerated at the MCC through three additional days of his own testimony, throughout the rest of trial, and for the next six months.  However, because of these significant issues with Todd's testimony and his remand, the Government elected not to call him as a witness at the subsequent Buffalo Billion trial, which impacted its presentation of evidence. Thankfully, a coconspirator who had been arrested back in September 2016 decided to cooperate, and the Government was able to secure additional convictions notwithstanding Todd's mistake.

On August 2, 2018, after six months at the MCC, the Court released Todd on extensive and detailed conditions.  (ECF Dkt. No. 56).  In light of the uncertainty about Todd's conduct with respect to the hotel and train charges, the Court ordered the Government and defense counsel to relay certain information in advance of sentencing, including whether Todd had submitted an affidavit in connection with the charge dispute.  (ECF Dt. No. 57).

Todd provided Capital One with authorization to release his entire dispute file to the Government, which in turn shared the documents with defense counsel.  Examining these documents revealed that Todd did not pursue the refund of the train tickets and hotel charge beyond the initial phone call with which he was confronted at trial and, while Capital One had initially refunded the charges, it reinstated the charges after Todd did not follow up or respond

23

to its request for supporting documentation or a formal statement of dispute.[4]  Todd thus did not

complete an affidavit or otherwise proceed with his charge dispute, and the charges remained.

The Court may consider this evidence along with the negative impact Todd's mistake had on his

testimony and on the Government's position with respect to its order of proof.

From the time that Todd was released from the MCC, Todd has abided by his conditions

of release, including quickly obtaining full-time employment, making timely payments to the

IRS, and controlling his spending (for which all accounts are managed by his spouse).  In

finding the idiomatic silver lining, Todd has also realized that the six months he spent

incarcerated at the MCC greatly contributed to his overall rehabilitation.  In Todd's own words:

> I recall after I was incarcerated at the MCC—a life-changing, lonely and
> emotional period in my life—I realized just how badly I needed to pull myself
> together . . . I realized how foolish I was to throw aside all the successes and
> achievements I had accomplished when I broke the law. And all because the
> advantages and successes were never enough. My time at the MCC and these
> realizations have motivated me like never before to earn an honest living, to
> appreciate the blessing of being with my family, and to make a difference in
> my new community.

T. Howe Ltr., Ex. A at 3.

## C.  Todd's Efforts to Build a New Life

Over the past almost three years, Todd has worked slowly but surely toward creating a

healthy, law-abiding, productive life for himself and his family.  Todd's actions and mindset

demonstrate his desire to use this experience—including his incarceration—as a catalyst for

positive change.

First, Todd set out to confront and address his financial problems, including the

psychological causes.  In August of 2016—early into his cooperation with the Government but

---

[4]   Defense counsel understands that the Government will summarize the charge dispute in its
5K1.1 Letter and thus counsel has not provided the relevant Capital One documents here.
Counsel will provide these documents at the Court's request and bring copies to Todd's
sentencing on April 5, 2019 in the event the Court requests them at that time.

prior to his surrender and criminal charges—Todd began seeing a licensed psychotherapist in Washington who specializes in addiction and compulsive behaviors.  As his therapist notes in her statement of character, she counseled Todd for seven months prior to his move to Idaho, during which they delved into the poor decisions he had made, the reasons for those decisions, and the impact on and future of his life.  *See* S. Berlin Ltr., Ex. T at 1.  Ms. Berlin confirms that Todd "expressed remorse for all that happened regarding his behaviors" and that he is, at heart, a "gentle, kind, caring and thoughtful" man who "has been doing all he can to live a better life and to be there for his family."  *Id.* at 2.

In his reflections about his therapy and the time he had to think while incarcerated at the MCC, Todd observes:

> I've thought a lot about a source of pride that I believe I got from my father—I have always wanted to say yes to everyone and to do a good job for them. I wanted this especially when I was working in public service, and over time, my need to say yes and get the job done became a source of money and influence. I started to say yes in situations where I knew couldn't deliver. I didn't want to disappoint my clients, my friends or most importantly my family, and I didn't want to lose the money or the influence for myself. So I chased that money and influence down a road of actions that I deeply regret. I allowed myself to get into debt, and then further into debt, and I could not admit that to anyone, most of all not to my family. Instead of solving my financial problems in an honest way, I turned to crimes to solve my problems and then tried to hide those crimes. At some point it was like I could not stop, or it would all unravel. Sitting here now, I can't believe I lived that way for so many years. I can finally breathe.

T. Howe Ltr., Ex. A at 1.

Second, Todd and Sarah moved over 2,000 miles away from Washington, D.C., in large part to remove themselves from the fast-paced, pressure-filled life in which Todd allowed himself to become caught up in a cycle of corrupt criminal dealings.  Having come to certain realizations in his therapy, Todd understood that extracting himself from the situs of his crimes and the

penumbra of temptation was the only way to truly begin a new life.  So Todd and Sarah sold their home and moved across the country from their children, siblings, and friends.

But the upheaval has been worthwhile.  Todd is thriving in the simpler, "salt-of-the-earth" environment.  T. Howe Ltr., Ex. A at 1.  Todd and Sarah live very simply compared to their life in Washington, D.C.  They have a modest one-bedroom apartment and, as Sarah notes, they have made many adjustments that "seem like minor changes, but these things add up."  S. Howe Ltr., Ex. B at 2.  "Instead of cable TV, [Todd] has a library subscription . . . he rides his bike a few miles to work every day, even in below zero temperatures."  *Id*.  Todd explains that "[w]e enjoy simpler pleasures now like biking, hiking the mountains, taking long walks with our dog, [and] reading," all of which have caused Todd to feel "more at peace with this new lifestyle and [to be] in a much better place, both mentally and physically."  T. Howe Ltr., Ex. A at 2.

With these changes, and with Sarah's help and oversight, Todd has learned to control his spending and stop "chasing" ephemeral satisfaction that was cyclically "never enough."  *Id*. at 3.  Todd believes in many ways that his life in Idaho is rooted in the same values as his childhood growing up on an unnamed country road in rural upstate New York.  Todd has found his existence in Idaho to be "therapeutic" and has learned to listen to his true nature once again.  *Id*. at 2.

Finally, Todd has been working a hard and honest job.  When Todd first moved to Idaho in March 2017, he found a supervisor at a Sun Valley resort willing to "take a chance" on him.  T. Howe Ltr., Ex. A at 1.  Todd initially worked part-time maintaining the resort's golf course for its summer and fall guests.  *See* A. Bliss Ltr., Ex. U at 1.  Todd worked hard over the next nine months and gained the trust and confidence of his supervisor.  *Id.*

When Todd was remanded to the MCC in February 2018, he was crestfallen and ashamed to tell his supervisor about what happened.  But his supervisor was encouraging: he told Todd that

Todd would get through this and that he was welcome back to work at the resort when he was able. That is precisely what transpired.

When the Court saw fit to release Todd in August 2018, he returned immediately to Idaho. Within a few days, he had secured his old job and gone back to work. About six weeks later, Todd was promoted to be a full-time employee. His supervisor notes that "[t]he major reason Todd is now a Full-Time Employee at the Resort is because I recommended him to Mountain Operations for Winter employment, a recommendation that I do not take lightly as both a Supervisor and a Manager." A. Bliss Ltr., Ex. U at 1.

Todd's supervisor continues to speak highly of Todd: "[Todd] has been an exemplary employee. His work ethic, his punctuality, his dedication to the job, his reliability and his ability to interact with the other employees on our team has been exceptional." *Id*. Todd's supervisor observes that many of the qualities Todd learned from his father and passed along to his own children are evident in Todd's current work. "Todd is always one of the first employees to arrive at work and one of the last to depart at the end of the day . . . his ability to exercise good judgment on a daily basis is a trait that I value immensely as a Supervisor . . . Todd has also been a great mentor to many of my younger employees . . . helping them to be better employees for me [and] guid[ing] them with some personal issues outside of work so that they become better people in our society." *Id.*

By all accounts, Todd has transformed the lowest point in his life into a turning point. He has reawakened the values he learned at his father's side that have always been part of his true nature, which is guiding Todd in rebuilding his life positively and productively.

## SENTENCING ANALYSIS

As the Court well knows, the Supreme Court held in *United States v. Booker* that the Guidelines are "effectively advisory."  543 U.S. 220, 245 (2005).  Although the Court is obligated to give fair consideration to the Guidelines, "a district court may not presume that a Guidelines sentence is reasonable."  *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).  The factors set forth in 18 U.S.C. § 3553(a) are therefore increasingly important because they guide the Court in "consider[ing] every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Koon v. United States*, 518 U.S. 81, 113 (1996). "Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime."  *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011).

## I.   The Presentence Investigation Report Recommends a Sentence of Time Served

The United States Probation Office ("Probation") disclosed the final presentence investigation report ("PSR") on December 3, 2018.  Todd does not have any substantive objections to the PSR, which provides a detailed picture of his life and his conduct.

Critically, in view of all the details about Todd's life and his conduct—including his trial testimony and remand—Probation "respectfully recommend[s] that Your Honor impose a sentence of Time Served to be following by three years' supervised release on each count of conviction, with all terms to run concurrently."  PSR Addendum at 36.

In addition, the PSR notes that Todd "has been in compliance with all terms and conditions of his pretrial release, since his most recent release from custody on August 2, 2018. He is not viewed as a flight risk or a danger to the community."  *Id*. at 40.

Todd respectfully submits that Probation's recommendation of a sentence of time served is warranted, appropriate, and just in light of his substantial cooperation, "the sentences imposed for several of his co-conspirators," and his history of kindness and generosity of spirit. *Id*. at 36.

## II.   The Purposes of Sentencing Are Served by a Sentence of Time Served

The mandate of 18 U.S.C. § 3553(a) directs the Court to "impose a sentence sufficient, but not greater than necessary," to comply with the purposes of sentencing. *United States v. Stewart*, 590 F.3d 93, n.30 (2d Cir. 2009).  In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court summarized the many factors a sentencing court should consider before exercising its latitude to "make an individualized assessment of the sentence warranted by Section 3553(a) based on the facts presented." *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008) (internal quotations omitted).

The factors set forth in § 3553(a) counsel in favor of a sentence of time served for Todd Howe.  In conducting an analysis of the § 3553(a) factors, Todd respectfully requests that the Court give particular consideration to the following factors: (1) Todd timely and fully accepted responsibility for his conduct and cooperated extensively with the Government; (2) Todd's personal history and characteristics are indicative of a civic-minded, giving, caring man who is capable of moving forward in a positive fashion and becoming a societal asset; and (3) the need for just punishment and deterrence.[5]

---

[5]  In fashioning a sentence that is "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a) requires the Court to consider: the "(1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) just punishment (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution." *Rita v. United States*, 551 U.S. 338, 347-48 (2007).  The analysis presented herein will not address factors (3), (4), (5), or (6) because they are either not applicable to Todd or are not substantively at issue here.

### A.  The Sentencing Guidelines Calculation

According to the PSR, Todd's total offense level and resultant Sentencing Guidelines range suggests a term of imprisonment between 262 to 327 months.  PSR ¶ 115.  This is an astronomical number.

Courts have agreed that, in financial fraud cases, the Guidelines place an "inordinate emphasis" on "putatively measurable quantities, such as . . . the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors."  *United States v. Adelson*, 441 F.Supp.2d 506, 509 (S.D.N.Y. 2006) (JSR).

Counsel understands that the Court has reached its own determination about the loss amount—and therefore the Guidelines calculation—on the basis that the loss amount in 2B1.1(b) does not apply.  *See United States v. Ciminelli*, 16-CR-776 (VEC), Dec. 3, 2018 Sentencing Tr. at 14-16; *United States v. Gerardi*, 16-CR-776 (VEC), Dec. 6, 2018 Sentencing Tr. at 11-12.

Todd takes no position on the Guidelines calculation here and instead respectfully seeks a sentence of time served based on Probation's recommendation and other § 3553(a) factors including his substantial cooperation and his significant efforts toward rehabilitation.

### B.  Todd's Acceptance of Responsibility and Substantial Cooperation

As the Court knows, U.S.S.G. § 5K1.1 allows courts to depart from the Guidelines upon motion by the Government stating that the defendant has provided "substantial assistance."  In considering a departure on this basis, the Court may evaluate, among other things, "the significance and usefulness of the defendant's assistance [including] the Government's evaluation of the assistance rendered," "the truthfulness, completeness, and reliability" of the information provided, and "the nature and extent of the defendant's assistance."  U.S.S.G. § 5K1.1.

There are no limitations on the method used or degree to which the Court departs from the Sentencing Guidelines; indeed, the Court is empowered with discretion to award an appropriate

reduction consistent with the non-exclusive list of factors, and the Court is authorized to impose a non-incarceratory sentence.  *See United States v. Cunavelis,* 969 F.2d 1419, 1421-1422 (2d Cir. 1992); *see also United States v. Blake,* 89 F.Supp.2d 328, 340 (E.D.N.Y. 2000).

The ultimate decision for Todd to plead guilty and cooperate was difficult, and the reality of the investigation and events of the raid took time to come into focus for him.  But after Todd confronted the depth and severity of his conduct and disclosed it to his family, the choice to cooperate was never again a substantial question in his mind or heart.

Though his plea and cooperation required Todd (and his family) to endure significant negative press, to provide information about and testify against people whom he had considered friends, and to lose the respect of his peers and colleagues, countless friends, and his reputation, Todd knew that confronting his past and accepting responsibility for his actions was the only way to make amends for his wrongs and move his life forward.  *See United States v. Douglas*, 713 F.3d 694, 702 (2d Cir. 2013) (noting that "reduced sentences for cooperation are only partially a *quid pro quo* for assistance to the government.  Cooperators also receive reduced punishment in part because their willingness to assist the government can signify a renunciation of criminal associations and the beginning of a new life.").

As discussed in detail above, Todd's cooperation in this case has been significant.  Todd was the first and only individual who cooperated prior to the Government charging the Percoco and Buffalo Billion schemes.  Todd met with the Government more than 30 times over the course of approximately 18 months.  He spent hundreds of hours proffering valuable information and pouring over hundreds or even thousands of documents.  He illuminated the relationships among participants in the schemes and their specific roles, intricacies about the State government procurement process, the flow of money, and especially the hard-to-detect connection between Aiello and the payments to Percoco.  Todd consented to an iCloud search that provided new

documents to the Government, and he explained the coconspirators' "code."  In short, Todd lined up all the red flags in an order that was clear and useful to the Government in helping it to build its trial cases for both the Percoco and Buffalo Billion schemes.

Todd testified at the Percoco trial for seven long days and was subjected to grueling cross-examination by multiple defense attorneys.  Notwithstanding Todd's remand mid-testimony, he brought a compelling and corroborated narrative to the Government's case.  Todd's assistance was integral to securing the conviction at trial of defendants Percoco and Aiello, and very likely contributed to the subsequent guilty plea of Braith Kelly.  Though the Government elected not to call Todd in the Buffalo Billion trial due to his own mistake, Todd's early cooperation assisted the Government in bringing charges against the Buffalo Billion defendants, and Todd's streamlining of evidence for the Buffalo Billion trial should be considered to his credit.  Simply put—and even in the harsh light of his errors—Todd's level of cooperation is above and beyond that of many defendants who receive letters of cooperation pursuant to 5K1.1.

Finally, Todd remains willing to assist the Government in connection with any subsequent needs resulting from appeals, further investigations, or other matters for as long as the Government requires.  Todd continues to view his assistance to the Government as one of his primary means of making amends for his wrongful conduct.  Accordingly, and based solely on Todd's significant cooperation which necessarily includes the six months he spent incarcerated at the MCC, Todd respectfully requests that the Court impose a sentence of time served.

## C.  Todd's Personal Characteristics Warrant Leniency

When analyzing the history and characteristics of an individual, courts frequently look to an individual's good deeds as a basis for exercising leniency.  *See United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (imposing a non-Guidelines sentence where

sentencing letters detailed "good deeds [that] were not performed to gain status or enhance [the defendant's] image.").

Defendants deserving of leniency based on their kind and giving nature are often distinguished "not by the amount of money [a defendant] has given, but by the amount of time [that person] has devoted," particularly when the defendant is "reluctan[t] to seek gratitude" for the kindness. *United States v. Serafini*, 233 F.3d 758, 775 (3d. Cir. 2000) (granting a downward departure based on defendant's actions that "weren't acts of just giving money, they were acts of giving time, of giving one's self."). Courts often recognize that small acts of kindness are as or more extraordinary than grandiose gestures or gifts. Indeed, it is the "private acts . . . that reveal something about the heart and conscience of the human being." *United States v. Whitman*, 12-cr-125 (S.D.N.Y.) (JSR), Jan. 24, 2013 Sentencing Tr. at 17:6-23; *United States v. Mehta*, 307 F.Supp.2d 270, 277 (D. Mass 2004) ("[T]he focus should be on the defendant's activities . . . particularly those that go beyond the kind of 'impersonal writing of checks . . .'"); *United States v. Serafini*, 233 F.3d 758, 773-75 (3d Cir. 2000) (upholding variance based on defendant paying an individual's electric bill to continue service and other kind acts).

By all accounts, Todd is a generous person who is giving with his time and energy in many meaningful ways, without seeking gratitude or expecting anything in return. Indeed, Todd has never refused a request for help from his family or friends—he is someone who "treated people with mutual respect, regardless of their status, lifestyle, or role." M. Arrington Ltr., Ex. Q at 2. Todd's sister-in-law, who has known him for 35 years, observes that "there are 'givers and takers' in life . . .Todd clearly fits into the category of a 'giver.' . . . I have never felt like he expects recognition or any favors in return for his acts of kindness." S. Morvillo Ltr., Ex. G at 1-2.

Todd's life is filled with many examples of the types of kind acts that the *Whitman*, *Serafini*, and *Mehta* courts found compelling. Many of the letters of support on Todd's behalf

33

provide anecdotes that demonstrate Todd's dedication to people's needs.  Following are a

handful of examples of the small, "private acts" that demonstrate Todd's true nature:

- "Todd has proven to be a dear loyal friend in good times, but particularly in bad. For example, after my divorce in 2003, Todd helped me relocate and establish a new life in the Washington DC area.  He scouted the area and found a perfect starter apartment for me.  Once I moved, he consistently made an effort to include me in family, social and community activities.  He guided me to sources of employment . . . He went above and beyond to make me feel welcome, loved and valued during a low point in my life.  I have gratitude towards Todd for this, as I feel like his support was a reason I eventually flourished in my new environment." S. Morvillo Ltr., Ex. G at 1.

- "[W]e acted as the U.S. family to a school friend of my brother's from Ghana who was not able to travel home to be with his family.  ███ spent the holidays and part of one summer with us and we all cared about him, but especially my dad treated him like a true member of our family.  I was not sure about the addition to our family at first, but my dad's example and kindness taught me to accept ███ into our family."  H. Howe Ltr., Ex. E at 2.

- "During my senior year [in high school], I was lucky enough to get an internship in Washington DC with Hannah Howe.  Mr. Howe opened his home to me and allowed me to live there during the duration of the internship.  During that time, he taught Hannah and myself about having a strong work ethic of never being late, going to work no matter what, and staying until the job was done . . .  It was very special for me to see a father who truly went above and beyond for his family." G. Davis Ltr., Ex. S at 1.

- "A fellow MCC inmate with no idea about how the legal system worked needed help preparing for his sentencing.  Todd worked with him for weeks on his presentation and letter to the Judge.  The inmate received a less severe sentence that he had expected."  S. Howe Ltr., Ex. B at 3.

- "[W]hen I was scrambling to get our house in Washington DC ready to sell . . . Todd recognized my stress and quietly offered to help.  He went through my list and took on a number of the items.  He came to my house with his tools in the pouring rain and installed a new doorbell.  He researched and installed a new dehumidifier to alleviate some basement issues.  He moved and organized furniture to be stored in the basement, and even helped some workers tear apart an old heating system to replace it.  These might sound like insignificant tasks, but they stand out to me because he brought so much relief to a stressful time without being asked."  S. Morvillo Ltr., Ex. G at 1.

- "[M]y soccer coach's father was Haitian, he spoke very little English and was in his 70s. He had been taken advantage of by a greedy lender who scammed him for thousands and thousands of dollars. My father took control of the situation . . . it took four months, but he finally figured out a way to get his house refinanced and get the man who scammed him out of his life. The part of this story that stands out to me the most is that I didn't find this out until two years later when my soccer coach thanked me for having my father help." E. Howe Ltr., Ex. F at 1-2.

- "[Todd] greets you with a warm smile when you meet him on the street. On several occasions I'd see him walking back from a neighbor's house after helping them with some project. When needed you can depend on Todd to go that extra mile for you." B. Tessler Ltr., Ex. O at 1.

- "Mr. Howe would still attend my team's summer trainings and games where I coached his son. He was one of a few parents, if not the only parent who attended all sessions and games. He took interest in our work . . . Mr Howe always asked how I was and took time to speak with me individually before and after our training which was far from the norm where other parents took no interest whatsoever. That is the quality I noticed in him, the time to engage and interact, not small talk but check on my well-being like any friend." A. Banadda Ltr., Ex. R at 1.

The above examples of Todd's dedication to others' needs illustrate his true nature apart from the conduct that brings him before the Court. Importantly, the many instances of kindness noted in the attached letters of support indicate that there is no particular time of his life in which Todd engaged in such activities—he has been consistent in his willingness to serve others. Indeed, "[t]here are dozens and dozens of stories like [those described above] where Todd has quietly and competently gone out of his way to positively impact the lives of others, without expecting anything in return." S. Howe Ltr., Ex. B at 3.

Considering the above observations and his significant efforts to reform his life, Todd is worthy of another chance. "[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F.Supp.2d 506, 513-14 (S.D.N.Y. 2006) (JSR). Accordingly, Todd respectfully

urges the Court to impose a sentence of time served so he that can continue to work, to care for his family, and to be an asset to society.

### D.  The Need for Just Punishment and Adequate Deterrence Has Been Satisfied

Section 3553(a)(2)(B)-(C) instructs the Court to impose a sentence that provides just punishment and adequately deters future criminal conduct by the individual defendant and by society generally.  Both significant punishment and substantial steps toward deterrence have already been accomplished in this case.

With respect to specific deterrence, courts deem the requirement satisfied when the "[e]limination of the defendant's ability to engage in similar or related activities . . . and the substantial loss of assets and income resulting from [his crime] have decreased for the foreseeable future his ability to commit further crime of the type he was tempted to undertake . . . constitutes a source of both individual and general deterrence."  *United States v. Gaind*, 829 F. Supp. 669, 679 (S.D.N.Y. 1993) (VLB).

As a direct consequence of his criminal conduct, Todd lost the career, reputation, and circle of friends that he spent a lifetime working to build.  He spent six months in harsh conditions at the MCC—even sustaining "a leg injury [that] persists . . . and will be a physical reminder of his actions . . .."  S. Morvillo Ltr., Ex. G at 2.  Todd will be forever changed by these experiences, and he will carry that knowledge with him as a deterrent.

Further, Todd provided substantial assistance to the Government at great expense to the private lives of his family: his family has been featured in media coverage they never invited; ███
████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████. Todd accepts that none of

these consequences would have befallen his family but for his own conduct.  His attendant shame

and grief over these collateral consequences are all the deterrents Todd needs.

In the nearly three years following his surrender, Todd has also spent much of his time

making amends for his conduct.  He cooperated extensively with the Government.  He has made

significant strides in establishing a new life away from the temptations of his former existence.

He has the emotional support and encouragement of his family and his new employer.  Since his

release from the MCC, he has observed his release conditions and continues to make regular,

timely payments toward his tax debt.  He is able to help support his family again, and he aims to

███████████████████.  He is becoming a valuable member of his community in Idaho.

These facts suggest that Todd will have a greater impact on his family's life and on society as a

whole if he is permitted to remain free.  His positive example of rehabilitation and the benefits

of a law-abiding life will provide hope and example as a greater deterrent than a further period

of incarceration could provide.

With respect to general deterrence, further incarceration for Todd is not required to satisfy

this sentencing aim.  Here, the stigma, public humiliation, loss of reputation, loss of career, the

negative publicity, the prison sentences of numerous coconspirators, and the six months Todd

spent at the MCC send a loud and clear message to potential offenders.  There is "considerable

evidence that even relatively short sentences can have a strong deterrent effect on prospective

'white collar' offenders." *United States v. Adelson*, 441 F.Supp.2d, 506, 514 (S.D.N.Y. 2006)

(internal citation omitted); *see also United States v. Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001)

(Nygaard, J. dissenting) ("It is widely recognized that the *duration* of incarceration provides little

or no general deterrence for white collar crimes.").  These events coupled with the national public

corruption scandals consuming the media are together making the consequences known to those

who may breach positions of public trust. An additional term of incarceration for Todd will not move the needle any further.

Finally, with respect to just punishment, Todd has been and will continue to be punished for his egregious conduct in this case. Todd has accepted responsibility for his actions and will continue to live with the consequences—personal and collateral—of his conduct, including his time at the MCC, his loss of career and reputation, and the impact to his children and spouse noted above. These are intensely personal forms of punishment. Accordingly, the Court may properly consider these collateral consequences in assessing the need for just punishment under § 3553(a)(2). *See United States v. Pauley*, 511 F.3d 468, 47475 (4th Cir. 2007) (affirming district court's reduced sentence based in part on defendant's loss of his teaching certificate and state pension as a result of his conduct).

In light of Todd's substantial cooperation, the collateral consequences of his criminal conviction, and the substantial efforts he has made in moving his life forward, a sentence of time served provides just punishment for Todd's offense and acts as a powerful deterrent to Todd and to society as a whole.

### E. Restitution, Forfeiture, and IRS Payments

Todd and the Government have agreed on figures for his restitution and forfeiture orders. Pursuant to Todd's cooperation agreement, he previously agreed to pay restitution in the amount of $1,706,542 to WOH pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

The Government recently calculated and proposed a forfeiture order in the amount of $2,835,000. This amount is comprised of: (1) $35,000 in bribes that Todd controlled (through Potomac Strategies) and ultimately paid to Percoco on behalf of COR; (2) $800,000 in payments from CPV, COR, LPCiminelli and CNSE (SUNY Poly) to WOH for the benefit of Todd's lobbying and consulting services, which necessarily involved the illicit conduct in connection

38

with the government aspects of these projects; and (3) $1,706,542 in the embezzled funds from

WOH, which the Government can again claim pursuant to 18 U.S.C. §981(a)(1)(C) and 28

U.S.C. § 2461.

Todd has agreed to these restitution and forfeiture figures.  Todd also previously agreed to

make payments of $1,000 per month toward his $714,027 tax liability from the years 2010

through 2015 in connection with the embezzled funds on which he failed to pay taxes.  Todd

agrees that this monthly payment should be incorporated into his final disposition.

## CONCLUSION

Todd Howe is truly remorseful for the conduct that has brought him before this Court.  He

realizes the harm that his actions caused.  He is ashamed of the way he acted and is committed to

living the remainder of his life as an honorable and productive person.  In the time since his

surrender, Todd has tried to right his wrongs.  His cooperation with the Government has been

substantial.  He has recreated his life in a "salt-of-the-earth" manner, putting in an honest day of

physical work for honestly-earned pay.  He is meeting his obligations set out by the Government,

the Court, and the IRS.  He has confronted the shame over his past debts, improved his financial

behavior, and learned to control his spending and related impulses.

Todd recognizes that he must be vigilant and committed to his rehabilitation, but he has

made great strides in resuming his place as a productive member of society.  In short, Todd is

doing that which society desires of anyone who has committed a crime— he has abandoned his

previous profession and life, provided substantial assistance to the Government, and begun

making positive contributions to society once again.

In closing, the words of Todd's friend and retired law-enforcement officer, Major Lloyd

Wilson, provide guidance to the Court in making its decision:

I have spent much of my adult life in law enforcement and one of the traits I have developed . . . is being able to determine fact from fiction.  Having known Todd as long as I have, I can unequivocally say that the actions taken by Todd are not who he truly is.  But my law enforcement experience also forces me to recognize that good people can do bad things for many different reasons and often without anyone knowing.  But that is where the fact and fiction come in.  I believe it is a matter of fact that Todd made a series of poor choices, but at his foundation, he is a solid individual who cares for and loves his family and friends and honestly looks for ways to make our society better . . . I would ask that you extend leniency to Todd so that he is able to remain with his family, continue working and bring that knowledge and positive energy that he has always demonstrated back to the community in which he now resides.

L. Wilson Ltr., Ex. I at 1-2.

For these reasons, Todd respectfully requests that the Court exercise great leniency in

sentencing him to a period of time served.

Dated March 22, 2019
New York, New York

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

/s/ Savannah Stevenson
Savannah Stevenson
Richard Morvillo
51 West 52nd Street
New York, New York 10110

*Attorneys for Defendant Todd Howe*

40