```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          16 CR 00632 (VEC)

 5   TODD HOWE,

 6              Defendant.
                                           Sentence
 7   ------------------------------x

 8                                         New York, N.Y.
                                           April 5, 2019
 9                                         2:00 p.m.

10   Before:

11
                      HON. VALERIE E. CAPRONI,
12
                                           District Judge
13
                            APPEARANCES
14
     GEOFFREY S. BERMAN
15        United States Attorney for the
          Southern District of New York
16   BY:  JANIS M. ECHENBERG
          MATTHEW D. PODOLSKY
17        DAVID ZHOU
          ROBERT BOONE
18        Assistant United States Attorneys

19   ORRICK, HERRINGTON & SUTCLIFFE, LLP
          Attorney for Defendant
20   BY:  SAVANNAH STEVENSON

21   Also Present:
     Special Agent Delissa Pendland
22   Gary Jackson

23

24

25
```

1                    (Case called)

2                    MS. ECHENBERG:  Good afternoon, your Honor.  Janis

3      Echenberg, for the government.  With me at counsel table are my

4      colleagues, Matthew Podolsky, Robert Boone, and David Zhou,

5      Special Agent Delissa Pendland and Gary Jackson.

6                    THE COURT:  Good afternoon.

7                    MS. STEVENSON:  Good afternoon, your Honor.  Savannah

8      Stevenson, for Mr. Howe.  And, of course, Mr. Howe is here

9      today.

10                   THE COURT:  Good afternoon.

11                   Good afternoon, Mr. Howe.

12                   Please be seated.

13                   Okay, Ms. Stevenson, have you and your client read the

14     presentence report dated, December 3rd, 2018?

15                   MS. STEVENSON:  We have.

16                   THE COURT:  Have you discussed it with each other?

17                   MS. STEVENSON:  Yes, we have.

18                   THE COURT:  Mr. Howe, did you read the presentence

19     report?

20                   THE DEFENDANT:  Yes, I did, your Honor.

21                   THE COURT:  Did you discuss it with your lawyer?

22                   THE DEFENDANT:  Yes, I did.

23                   THE COURT:  Ms. Stevenson, do you have any objections

24     to the report?

25                   MS. STEVENSON:  We do have several changes,

1    your Honor.

2          THE COURT:  All right.  Hang on a second.

3          Okay.

4          MS. STEVENSON:  Okay.  First, your Honor, looking at

5    paragraph 11 on page five.

6          THE COURT:  Yes.

7          MS. STEVENSON:  We note that in the -- the second line

8    notes that Mr. Howe pled guilty without the benefit of a plea

9    agreement.

10          THE COURT:  Okay.

11          MS. STEVENSON:  And, of course, he pled pursuant to a

12    cooperation agreement.  So we request that change.

13          THE COURT:  Okay.

14          MS. STEVENSON:  In the same paragraph, your Honor, at

15    the end, I believe that it misstates the date that this case

16    was reassigned to you.  It states March 20, 2018.  I believe it

17    was 2017.

18          THE COURT:  Is that right?  It was during the trial or

19    right after -- shortly after the first trial.

20          MS. STEVENSON:  Well, it was 2018.

21          THE COURT:  I think that's right.

22          MS. ECHENBERG:  Yeah.  My recollection was after

23    trial.

24          THE COURT:  It was definitely after Mr. Howe was

25    remanded.

1          MS. ECHENBERG:  Correct.

2          MS. STEVENSON:  Yes.

3          We're looking at paragraph 24 on page seven.

4          THE COURT:  Yes.

5          MS. STEVENSON:  There is an extra digit in the number

6    towards the bottom of that paragraph.  It states $351,000.  It

7    should be $35,000.

8          THE COURT:  Yes, it should.

9          MS. STEVENSON:  And then looking forward to paragraph

10   37 on page 12.

11         THE COURT:  37 on page 12.  Okay.

12         MS. STEVENSON:  The language in this paragraph is

13   somewhat misleading, your Honor, in that it states that this

14   amount is a reasonable estimate of the benefit received by Howe

15   from CPV.  And that 1.5 million figure was actually received by

16   CPV.

17         THE COURT:  Yes.  So, Howe should be CPV.

18         MS. STEVENSON:  Yes.  Thank you, your Honor.

19         THE COURT:  Any objections?

20         MS. ECHENBERG:  Your Honor, I believe we've discussed

21   most of these originally.

22         THE COURT:  Okay.

23         MS. STEVENSON:  At paragraph 49 on page 14.

24         THE COURT:  Yes.

25         MS. STEVENSON:  I understand in prior sentencings in

1   this matter, your Honor has made a finding that the loss in the

2   Buffalo Billion scheme is actually zero.

3            THE COURT:  Correct.

4            MS. STEVENSON:

5            THE COURT:  So, what should that number be?  So, it's

6   the total of the -- I don't know what section of the PSR.

7            Is this discussing just the Buffalo Billion at this

8   point?

9            MS. STEVENSON:  No, your Honor.

10           MS. ECHENBERG:  So, if I could just -- I think

11  perhaps, your Honor, the addition might be to note, just in

12  addition to what's already here, that the Court made a finding

13  that there was no loss in the Buffalo Billions scheme, because

14  we still stand by our argument of the $36 million number, plus

15  the 1.5 from the Percoco scheme which I believe is what is

16  reflected in that 38 million here.

17           THE COURT:  Okay.

18           MS. ECHENBERG:  So, it's accurate as stated, but it

19  should be amplified by your finding.

20           THE COURT:  Okay.  I'll add a sentence that makes it

21  clear that I found that there was -- not that there's no loss,

22  but that it's not reasonably calculable.

23           MS. STEVENSON:  Right.  Thank you, your Honor.

24           THE COURT:  Okay.

25           MS. STEVENSON:  Skipping forward to paragraph 58 on

```
 1            page 16.

 2                      THE COURT:  Yes.

 3                      MS. STEVENSON:  In light of your Honor's finding --

 4                      THE COURT:  I'll take that -- when I go through the

 5            calculation, I'll take the 22 down to zero.

 6                      MS. STEVENSON:  Okay.  Okay.

 7                      THE COURT:  It's a plus 22, right?

 8                      MS. STEVENSON:  Yes.

 9                      THE COURT:  It may not be zero --

10                      MS. ECHENBERG:  I believe it takes it to the 1.5

11            million or the Percoco scheme.

12                      THE COURT:  Let me look.

13                      Actually, I show it as plus 18.  The loss table goes

14            -- it brings the loss table down to 3.5 to 9.5.  Because he's

15            got a million dollars in embezzlement plus the --

16                      MS. ECHENBERG:  Right.  That's right.

17                      THE COURT:  Is that right?  I mean, with cooperators I

18            do a sort of short form guidelines calculation.  And I think

19            what happened was I subtracted.  I come up with 4.2 million

20            between the embezzlement --

21                      MS. ECHENBERG:  So, you're adding the 1.5 to the 1.7?

22                      THE COURT:  Yes.

23                      MS. ECHENBERG:  It's to benefit the CPV.

24                      THE COURT:  Right.

25                      MS. ECHENBERG:  That makes sense.  That makes sense.
```

J4COtewMs                                                                                    7

1                MS. STEVENSON:  Yes.  We agree, your Honor.

2                THE COURT:  Okay.  So, that takes us to a plus 18.

3                MS. STEVENSON:  Correct.

4                On the following page, your Honor, paragraph 69 --

5                THE COURT:  Hang on just a second.  Let's go back to

6     58, because when I go through this, it's going to be very short

7     form.

8                Here's my calculation:  It's 1.7 embezzled from

9     Whiteman Osterman.  It's .7 in tax evasion.  These are

10    millions.  The COR bribery scheme is .03, and the Percoco

11    bribes are .3.  So that adds to 3 -- or 2?  My addition is off.

12    I have a decimal in the wrong place.  Let me see if that makes

13    a difference.

14               MS. ECHENBERG:  Your Honor, I just want to make sure I

15    understand the last two numbers.

16               THE COURT:  So, the benefit to the COR bribery scheme

17    was 30,000?

18               MS. ECHENBERG:  The benefit to --

19               THE COURT:  To the conspirators, to the scheme.

20               MS. ECHENBERG:  The benefit to Percoco was 35,000.

21               THE COURT:  Percoco was like 300,000.

22               MS. ECHENBERG:  Well, just with respect to COR.

23               THE COURT:  For COR was 30,000?

24               MS. ECHENBERG:  35,000, right.

25               THE COURT:  Okay.

```
 1            MS. ECHENBERG:  And then 287,000 was the benefit to --
 2            THE COURT:  Yeah.  I rounded it up to three.  It
 3   doesn't really matter.  That's not going to matter for this
 4   purpose.  But I still think I did the addition wrong.  I think
 5   it was whatever I said, one less than that.
 6            Yes.  It should be plus 16, which is what you said,
 7   right?
 8            MS. STEVENSON:  Yes, your Honor.
 9            THE COURT:  Should be plus 16.
10            MS. STEVENSON:  Thank you, your Honor.
11            THE COURT:  None of this is going to have any effect
12   whatsoever.
13            MS. ECHENBERG:  So, your Honor, I don't want to
14   overcomplicate this.  But in the prior sentencings, or at least
15   in the Percoco sentencing --
16            THE COURT:  Can you hold on just a second.  Let me
17   just complete.  Yes.  Go ahead.
18            MS. ECHENBERG:  So, in the Percoco sentencing, the
19   number -- the operable number, the number we relied on, was the
20   1.5-plus-million-dollar benefit to CPV.
21            THE COURT:  Right.  That's right.
22            For the CPV scheme; right?
23            MS. ECHENBERG:  Right.
24            THE COURT:  Okay.
25            MS. ECHENBERG:  And so, what I thought you were saying
```

1   when you calculated 18 was the 1.7 million embezzlement benefit

2   to Todd Howe.  And then you would add the 700,000 plus --

3          THE COURT:  Tax evasion.

4          MS. ECHENBERG:  -- tax evasion benefit and then add to

5   that the 1.5 plus.

6          THE COURT:  Right.  That is exactly what I did.

7          MS. ECHENBERG:  Okay.  And that --

8          THE COURT:  Is 18.

9          MS. ECHENBERG:  And that is 18.  And I agree with

10  that.  In our calculation, we had not included the embezzlement

11  tax, but we should.

12         THE COURT:  That was exactly what happened.

13         Okay.  So, we're back to where we were.  So it's plus

14  18.

15         MS. ECHENBERG:  Okay.

16         THE COURT:  Okay.  Next.

17         MS. STEVENSON:  The next page, your Honor, paragraph

18  69 on page 17.

19         THE COURT:  Yes.

20         MS. STEVENSON:  Under date sentence imposed, this

21  indicates that Mr. Howe was sentenced to six months'

22  imprisonment, but that's actually not correct.

23         THE COURT:  That's wrong.

24         MS. STEVENSON:  Which would mean there's only one

25  applicable point here instead of two, I believe.

```
 1            THE COURT:  Is that right?

 2            MS. ECHENBERG:  Yeah.  And just to clarify, the

 3   criminal history computation is a little bit confusing because

 4   they actually seem to apply four points, but then say the total

 5   is two.  And, in fact, in our view, there should be a single

 6   point for a prior sentence that did not result in

 7   incarceration.

 8            THE COURT:  Correct.

 9            MS. ECHENBERG:  And no additional points for an

10   instant offense while on probation.

11            I think the confusion is that the indictment date was

12   2010 but, in fact, the conduct began in 2012, when he was no

13   longer on probation from the original offense.

14            THE COURT:  Okay.  So, he's in criminal history

15   category one?

16            MS. ECHENBERG:  Correct.

17            MS. STEVENSON:  Yes, your Honor.

18            THE COURT:  Okay.

19            MS. STEVENSON:  We are almost there.

20            THE COURT:  No, no, no though.  Give me a minute.

21            MS. STEVENSON:  Okay.

22            THE COURT:  Okay.

23            MS. STEVENSON:  Paragraph 109 on page 26.

24            THE COURT:  109?

25            MS. STEVENSON:  Yes, your Honor.
```

 1                THE COURT:  Yep.

 2                MS. STEVENSON:  We would suggest simply adding a

 3      sentence noting that Mr. Howe has, in fact, filed those 2017

 4      taxes.

 5                THE COURT:  Which returns have been filed?

 6                MS. STEVENSON:  2017, your Honor.

 7                MS. ECHENBERG:  And we noted that in our submission as

 8      well.

 9                THE COURT:  Okay.  We'll add that.

10                MS. STEVENSON:  And then finally, your Honor, on page

11      27, at paragraph 115, you might be getting there anyway in your

12      calculation, but the guidelines need to be adjusted.

13                THE COURT:  Correct.

14                MS. STEVENSON:  And that is all that we have on the

15      presentence investigation report.

16                We would make one note about our sentencing

17      submission.  In the final page, on 38, we stated the agreed

18      forfeiture calculation around 2.8 million.

19                THE COURT:  Okay.

20                MS. STEVENSON:  But I failed to include all the

21      components of that.  It may not make a difference at this

22      point.  My explanation is that doesn't affect the fact that we

23      agreed to the $2.8 million.

24                THE COURT:  I think I got an agreed upon forfeiture

25      order, right?

1          MS. STEVENSON:  Yes, your Honor.

2          THE COURT:  That was signed by everybody.

3          Okay.  The presentence report, as corrected, will be

4     made part of the record in this matter and placed under seal.

5     If an appeal is taken, counsel on appeal may have access to the

6     sealed report without further application to this Court.

7          I received a sentencing submission from the defense,

8     dated March 22, 2019, that included letters from family and

9     friends of the defendant.

10          I received another letter dated April 4, 2019 that

11     included letters from Mr. Howe's friends at MCC.  And I

12     received an updated credit report, as ordered when he was

13     released on bail, dated April 3rd, which reflected compliance

14     with the terms of the pretrial release, at least as it affected

15     his getting credit.  And I received a 5K letter from the

16     government, dated March 22, 2019.

17          So the next step is the guidelines calculation.  Just

18     so we're all on the same page, the defendant pled guilty to

19     eight felonies ranging from tax evasion to wire fraud, to

20     extortion to various conspiracies.  The presentence report

21     reflects the guidelines level of 37, criminal history category

22     three, which yields a guideline range of 262 to 327 months.

23          For the reasons discussed during the sentencing of

24     Mr. Ciminelli, Mr. Gerardi and Mr. Aiello, I disagree with the

25     loss calculation.

1          The cumulative loss plus the benefit to Howe that is

2     reasonably estimable at 4.2 million.  That takes out the

3     construction fees for the Buffalo Billions projects and it

4     takes out fees that were paid to Whiteman Osterman & Hanna and

5     Potomac Strategies by COR, CPV and Ciminelli on the theory that

6     Howe was actually doing some legitimate government affairs work

7     for those clients.  Even assuming that some of those amounts

8     were ill-gotten gains, the loss table goes from 3.5 million to

9     9.5 million.  So regardless, the correct enhancement is plus

10    18.

11         In other respects, the presentence report correctly

12    calculates the guidelines other than his criminal history,

13    which we've already discussed.  So the total adjusted offense

14    level should be 33; criminal history category one, which yields

15    a guideline range of 135 to 168 months.

16         Two grounds -- actually I see one ground for departure

17    under the guidelines.  The government made a 5K motion, which

18    allows me to depart downwardly.

19         Are there any factual issues in dispute?

20         MS. ECHENBERG:  No, your Honor.

21         MS. STEVENSON:  No, your Honor.

22         THE COURT:  I'm going to ask the government if they

23    would like to be heard.  Let me just tell you a couple of

24    things that I would like you to address, if you're not already

25    addressing them.  You indicated in the 5K letter that Mr. Howe

1   came in to cooperate while the investigation was under way but

2   not complete.  So, my question generally is:

3         Was the government aware of all three schemes, that

4   is, the Buffalo Billions Scheme, CPV and COR, as it affected

5   Percoco before Mr. Howe began cooperating?

6         And second, Mr. Howe has been involved in government

7   affairs for a very long time.  Does the government have any

8   indication that he was involved in corrupt schemes prior to the

9   earlier scheme in this case, which would have begun when he

10   started embezzling from Whiteman Osterman?

11         MS. ECHENBERG:  Thank you, your Honor.

12         I'm going to go to the podium, if that's okay.

13         THE COURT:  That's fine.

14         MS. ECHENBERG:  As your Honor knows, for years, Todd

15   Howe was the center of two sophisticated corruption schemes.

16   Why was he at the center of those schemes?  Because he was

17   precisely the type of corrupt and compromised individual who

18   could be a partner in crime to Joe Percoco, Alain Kaloyeros and

19   the other businessmen defendants in this case.  He was the type

20   of person they needed and they wanted to execute their bribery

21   and their fraud schemes.  And Todd Howe came through for his

22   coconspirators.

23         The schemes in this case resulted in hundreds of

24   thousands of dollars for Percoco, millions for CPV, COR and

25   Ciminelli an increased power and job security for Kaloyeros.

And Todd Howe enriched himself, too, to the tune of millions of
dollars through consultancy fees and his own embezzlement and
tax evasion.

         And to your Honor's question, no, we were not aware of
other schemes prior to what he pled guilty to.  And I think, as
your Honor knows, as part of his cooperation to the extent that
there were approvable other crimes such as these, we would have
required that he plead guilty to those crimes.

         In June 2016, Todd Howe made a life-altering decision.
A few months earlier in April, the government had executed a
number of search warrants.  We searched Joe Percoco's home.  We
searched Todd Howe's home in his Washington, D.C. office.  And
we searched the home of Chris Pitts.  And I'm sure you remember
the friend of Braith Kelly's through who the bribes associated
with CPV were paid.

         At that point, when it had been an almost yearlong
covert investigation by the government, became an overt
investigation.  And after all the people that were implicated
in that investigation, Todd Howe is the only person who came
forward to cooperate.  Only Todd Howe began to proffer with the
government.  Only Todd Howe pled guilty before he was formally
charged, and only Todd Howe cooperated before anyone else was
convicted.

         And I'll address your Honor's second question, which
was:  Basically where were we at that point when he came

1    forward?

2           So, yes, we knew about all three schemes.  I think I

3    can fairly say that we were further along with some but not

4    others, but we were on our way and expected to charge all of

5    the schemes.  But as we set forth in our 5K letter, having a

6    person who could help us take what was an indescribable number

7    of documents that we had collected over that investigation and

8    help us narrow down particular timeframes, particular

9    communications or send us looking for specific things that he

10   recalled, was immensely helpful in those final months before we

11   charged the entire case.

12          So, in the summer months of 2016, and again in the

13   winter months of 2017 and early 2018, Todd Howe spent a lot of

14   time with the government.  We went through binders and binders

15   of documents.  We went over timelines of the relevant events.

16   And we talked a lot about his extensive history of fraud.  And

17   when Todd Howe testified at trial, his recollection of

18   conversations for which he was the only testifying witness,

19   significantly bolstered the government's case, and he brought

20   to life what was essentially a document case, without his

21   testimony.

22          So, if we could leave it at that, this would be a

23   relatively easy sentencing.  But, as you well know, that's not

24   this sentencing.  This sentencing is candidly one of the most

25   difficult that I have encountered.  Howe's behavior with regard

1    to money continued to be reckless, even after he cooperated,

2    even after he signed his cooperation agreement.  And because of

3    that, his testimony took that dramatic turn on the second day

4    of his cross-examination, and that resulted in his remand.  In

5    what I believe is an unprecedented move, we put our own

6    cooperator in jail in the middle of his testimony because there

7    was probable cause to believe he had engaged in a fraud that we

8    did not know about.  And that obviously had significant impacts

9    to that trial and to the trial that followed.

10           But with the benefit of time and with further

11   analysis, we've learned that he did not consummate that fraud.

12   And we've ultimately determined that, while he acted

13   thoughtlessly and recklessly just a month after signing his

14   cooperation agreement, he did not commit another crime that

15   would require us to void that agreement.

16           So, I think the question for the Court today is how

17   much this incident, which we have also discussed extensively in

18   our briefing, should offset Todd Howe's significant and

19   extensive cooperation that contributed to the conviction of

20   seven other individuals.  There's no doubt that his sentence

21   should reflect these post-cooperation transgressions.  And

22   whatever sentence your Honor gives will, of course, include the

23   six months that he's already spent in federal custody.

24           But it's the government's view that taking everything

25   into account, Todd Howe's cooperation meets or exceeds all of

 1    the factors that are set forth as reasons to depart under a

 2    5k1.1.  His cooperation, which was several months before anyone

 3    else was charged, was obviously timely.  His 20 months of work

 4    with the government was, without question, extensive,

 5    significant and useful to the government.  And his testimony

 6    about the relevant facts at trial was truthful and complete and

 7    reliable, and as we all saw in court, was extensively

 8    corroborated by the documented evidence.

 9         And finally, his assistance brought tremendous and at

10    times damaging spotlight on had him and his family.  He was, by

11    any measure, a very productive cooperator, who played a

12    critical role in a high-profile case that had a significant

13    impact, both in the number of people convicted, and in the

14    ongoing discourse about corruption in government.  And since

15    pleading guilty, he has made positive strides.  He's

16    significantly reduced his debt, including to the IRS and he's

17    been a productive member of his new community in Idaho.  And

18    his letters of support also evidence a man who, despite his

19    many faults, has been and continues to be generous and caring

20    to his friends and family.

21         So, for all of those reasons, and for all of the

22    reasons in our submission, we move under 5k1.1 that he be

23    sentenced under the factors of that section, in recognition of

24    his unique and substantial cooperation in an important

25    corruption case.  Thank you.

```
1              THE COURT:  Thank you, Ms. Echenberg.

2              Ms. Stevenson?

3              MS. STEVENSON:  Yes, your Honor.

4         The government has summed up Mr. Howe's cooperation

5    certainly better than I ever could.  And your Honor, has read

6    our submission.

7              With respect to the question that the government

8    raises about how much Mr. Howe's remand should impact what

9    happens here today, I think it's our position that the time

10   that Mr. Howe has had post-MCC suggests that his remand -- the

11   incident that led to his remand should not impact his sentence

12   at all.

13             When your Honor first raised the notice of a bail

14   application and ultimately released Mr. Howe last August,

15   your Honor said to Mr. Howe, This is your last chance.  Don't

16   mess it up.  And I would submit to your Honor that not only has

17   Mr. Howe not messed it up, but he's given the Court every

18   indication that he was, in fact, worth that chance and that he

19   is ready and able to move his life forward in a law-abiding and

20   productive manner.

21             Since being released from the MCC, Mr. Howe has met

22   all of his conditions of release, and I think he's, in fact,

23   exceeded the expectations.  Mr. Howe is thriving in his job.

24   As the letter from his supervisor indicated, he's excelling

25   both in terms of his work and in terms of making a difference
```

1  in the lives of other employees.  And even just in the past two

2  weeks, your Honor, Mr. Howe has, of his own accord, taken

3  advantage of the changing seasons.  He has chosen to go to work

4  at the Ski Hill from about 4:00 p.m. until about 1:00 a.m. and

5  then come home and turn it around and go to the golf facility

6  at about 7:00 a.m. to prepare for the summer.  So, he's working

7  from about 7:00 a.m. till 1:00 p.m.  And I think that Mr. Howe

8  is putting in these 18-hour days for several reasons that give

9  the Court a clear picture of his focus and determination.

10       First, as Mr. Howe noted in his own letter, the

11  physical work is extremely therapeutic for him.  The physical

12  labor is a daily reminder that an honest paycheck comes from

13  honest work.  And I think secondly, your Honor, and most

14  important to Mr. Howe, he is laser-focused on contributing to

15  his family again and to showing them that a rebirth is

16  possible.

17       And finally, your Honor, Mr. Howe is determined to pay

18  off those debts.  Since his release from the MCC, Mr. Howe has

19  timely made all his IRS payments and made steady progress on

20  his other debts, as you've seen in the credit reports that we

21  submitted this week.

22       And even aside from his work, your Honor, Mr. Howe is

23  finding opportunities in his Idaho community to help others.  I

24  think most significantly, Mr. Howe has connected with a number

25  of, what I think can be described as young, transient folks who

1   come to the mountain for seasonal work but don't otherwise

2   necessarily have any direction in life.  And he has used his

3   own personal story, including his period of incarceration, to

4   help them envision a future for themselves and take steps

5   toward achieving that, even in ways as seemingly simple as

6   getting up early and calling someone to wake up and make sure

7   they show up for work.  But that is meaningful to these folks.

8        So, your Honor, Mr. Howe is working hard.  He's

9   contributing to his family and he's finding small ways to be

10   helpful to his community.  And I would submit to your Honor

11   that if the time since his release from the MCC could be

12   considered a test, that Mr. Howe has undoubtedly passed that

13   test.

14        In closing, I'd like to make one personal observation,

15   your Honor.  I am here with Mr. Howe for what is likely my last

16   federal sentencing because I am moving on from law firm life

17   after today.  And in reflecting on that as it relates to

18   Mr. Howe, I am really struck by certain commonalities that he

19   shares with my very first federal sentencing years ago.  And

20   these commonalities really provide me bookends to my experience

21   that caused me and caused Mr. Howe to be very hopeful about our

22   criminal justice system and about Mr. Howe personally.

23        In that earlier CJA case I represented a narcotics

24   trafficker who was also a drug addict himself.  And because of

25   his arrest, he got the rehab he needed, he got clean, and he

1   got back to work.  And when he was sentenced, the Court looked

2   at that progress he had made and sentenced him to time served.

3          Now, I am still friends with that gentleman today.

4   And over time, he has been able to work up to becoming a deacon

5   with a small congregation at a church.  And this is a success

6   story, your Honor, and a success story that only happened

7   because the justice system intervened.  And I submit that the

8   same can be true here with Mr. Howe.  Because of this case,

9   because of his incarceration, Mr. Howe has, in his own way,

10  gotten clean.  He has unburdened himself from the shame and the

11  secrets and the lifestyle and the influences that caused him to

12  commit serious crimes.

13         And Mr. Howe has gotten back to work.  He's feeling

14  that satisfaction and that freedom with knowing that what you

15  get is what you earn.  And like my old client and friend,

16  your Honor, Mr. Howe has given me every indication and every

17  hope that once he firmly regains his footing, he will

18  contribute to his community in even more significant ways.

19  But, of course, I know that, like my old client and friend,

20  Mr. Howe's continued progress and continued ability to make

21  amends depends in part on the Court's decision today.

22         And so, for all of the reasons that we cite in our

23  sentencing memorandum, and for the reason of -- for the fact of

24  Mr. Howe's demonstrated progress and ability to move forward,

25  we'd respectfully request a sentence of time served and believe

 1    that that's warranted and appropriate in this case.  Thank you.

 2              THE COURT:  Thank you, Ms. Stevenson.

 3              Mr. Howe, would you like to be heard?

 4              THE DEFENDANT:  I would, your Honor.

 5              THE COURT:  Okay.  You have the floor.  Just make sure

 6    you have a microphone that's somewhere close to you and speak

 7    up nice and loud.

 8              THE DEFENDANT:  Sure.  Your Honor, thanks for the

 9    opportunity to address the Court.  I appreciate that.

10              First and foremost, I want to say I broke the law,

11    broke many laws.  I'm responsible for my actions and my

12    behavior.  And those actions have brought me here, and my

13    behavior and breaking the law has brought me here today in

14    front of you.  I feel compelled and driven by my heart to say I

15    apologize to my wife of some 35 years, my two children, who I

16    love and adore.  My former employee or former business

17    associates, my employer, I apologize to.  Also, having been in

18    public service, I certainly want to apologize to the public

19    servants in New York State that in some way may have been

20    touched by this scandal; it has, no doubt, probably affected

21    some of them, because they do great work and are really in it

22    for being a public servant.  So, I apologize to them as well.

23              Your Honor, when I went to MCC, obviously it was a

24    horrible situation for me.  But it was a learning experience.

25    I got up every day, looked in the mirror.  It's not even a

mirror.  It's a polished piece of stainless steel, I guess, or
whatever it was.  But I would look every day, and I'd ask
myself:  Why did I do what I did?  Why did I throw everything
away?  Why did I embarrass my family and my colleagues, my
employer?  Why did I do all of those things that I pled guilty
to?  And I take full responsibility for every one of them.

        And so, I spent several months, as you know, there.
And I looked deep down inside and I did a lot of sort of
self-exploratory and sort of digging to find out why I did the
things I did.  And I slowly but surely came up with -- there
were many obviously.  But I sort of zeroed in on three that I
think were instrumental in my demise and that I'm extremely
sorry for.

        First was my inability to say no.  I always said yes.
And in this case, I said yes to the wrong people, and I should
have said no to those people.  And I'm not saying it was their
fault.  I'm saying it was something that I have been always, a
guy that always said yes to everything because I didn't want to
disappoint everyone.  And so, that is a factor that I thought
about long and hard and realized I should -- I needed to be
able to say no, but to say yes to the people that really
deserved to be said yes to.

        The second factor that I identified -- and it took a
while until I thought this one through -- was, as I indicated
during the trial, I lived a lifestyle that was beyond my means

for many years.  And I think my wife referenced -- because I talked to her about this.  My wife referenced in her letter to you, your Honor, that it was almost like a duck across a pond. I mean, it was a fluid, flowing duck across the pond.  No one sees any ripples, but underneath there is this ruckus and chaos and churning all sorts of things up from the bottom that nobody sees.  And that was very much like me in the sense that I tried to keep this image of sort of no ripples on the top, but underneath I was scavenging and digging and, you know, kicking my feet day after day in order to stay above water.  So, that was one of the factors.

The third factor was -- and, again, I'm not blaming this on anybody else, it was my responsibility.  The third factor was that I had -- I was in Washington, D.C.  And I was in Albany and York, and I was in government affairs and politics.  And to be relevant in those worlds, unfortunately -- and it certainly was not what our forefathers ever envisioned when they thought of lobbying or government affairs -- was I had to stay relevant and I had to stay successful.  In order to stay successful, I broke laws to be successful.  And that was unacceptable obviously.

So, there was that environment that I was in that I constantly, in order to be viewed as successful in the lobbying business, I did things that I shouldn't have done.  And it was it is in that environment that I feel it was a tough

1    environment to be in, but I did the things I needed to do to be

2    relevant, unfortunately.

3    All those factors, those three factors -- and

4    obviously more that I'm going to think about over time that I

5    know will probably surface -- brought me to think when I was at

6    MCC that I thought, the day, if and when I ever get out of MCC

7    -- it's almost like an individual who's had a near-death

8    experience, they always come out and say they have a new lease

9    on life.  And I thought to myself, you know, I'm going to live

10   every day to the fullest and work my tail off.  I'm going to be

11   in a pretty isolated little town doing physical labor, but I'm

12   going to be honest and I'm going to walk a line of honesty and

13   truthfulness.  I'm going to fulfill my financial obligations.

14   I've been paying, as counsel said, my IRS bills every month.

15   Living a very modest lifestyle with my wife, who I love very

16   much.  And I'm going to work to regain my trust amongst my

17   family first, and I'm going to try to contribute to my

18   community as much as I can and be helpful to folks in my

19   community.

20   In some ways, your Honor -- and this might sound

21   ironic -- I think going to MCC, although it was a horrible

22   experience was probably the best experience for me because it

23   made me realize all the things I had lost and it also made me

24   realize the things I needed to change.

25   And I hope that what you've seen in the last several

1   months by my actions have demonstrated more than words that I'm

2   doing what I should be doing and I'm living, in my mind, a

3   simple life, which I enjoy.

4          And I would ask that you continue to let me make

5   progress in that direction and let me stay there and continue

6   to work hard and do all the things I'm doing for my family.  I

7   believe I'm working and doing as much as I can, and to fulfill

8   that path, I need to be an honest citizen and contribute to my

9   community.

10         Thank you, your Honor.

11         THE COURT:  Thank you, Mr. Howe.

12         Mr. Howe, federal law requires me to consider the

13  nature and circumstances of the offense and the history and

14  characteristics of the defendant.

15         Mr. Howe is a 58-year-old college graduate.  He

16  started his career working for the government, but for about

17  the last fifteen years of his professional life, worked as a

18  lobbyist.  By all accounts, Mr. Howe was a successful lobbyist.

19  It is fair to say that Mr. Howe knew most of the politicians in

20  Albany and knew how to get things done in state government.

21  People would take his calls.  And critically, for people like

22  Alain Kaloyeros, Howe knew how to get someone within the good

23  graces of Andrew Cuomo.

24         While the defendants in this case all profess to be

25  shocked by the Todd Howe that was revealed during this trial,

1   it is safe to say that their companies hired Todd Howe because

2   Todd Howe was good at what he did.  And while the defendants

3   cooperated against may have been unaware of the train wreck

4   that Mr. Howe's personal, financial life had become, they were

5   well aware of the ways in which he had obliterated the line

6   between legitimate lobbying and legitimate government affairs

7   activities, and illegal bribery and extortion.

8            Mr. Howe has two grown children and he has been

9   married to the same woman for over 30 years.  As a result of

10  this case, he and his wife have moved to Idaho where he's

11  working in a resort town in Ketchum, Idaho, which is a

12  beautiful place.

13           Howe's last ten years, starting around 2009 or 2010

14  were a downward spiral.  Although he was making a very sizable

15  salary, it put him in the top five percent of owners

16  nationwide.  Howe was spending way more money than he was

17  making.  That included putting his children into expensive

18  boarding school, owning very nice houses in a ritzy area,

19  driving very expensive cars, and apparently doing all kinds of

20  other stuff to flitter away huge sums of money.

21           He supported his overindulgent lifestyle by stealing

22  from his employer, defrauding merchants and tradesman and

23  borrowing money from a wide variety of friends who frequently

24  had too sue Mr. Howe in order to be repaid.  That said, those

25  friends were continuing to stand by him, and his family

1    described him as the salt of the earth, someone always there

2    for his family and quick to help his friends.

3              Finally, if not like many cooperating witnesses in

4    white-collar cases, Todd Howe has had a taste of jail.  The

5    government revoked his bail during the Percoco trial based on

6    probable cause that he actually attempted credit card fraud

7    after signing his cooperation agreement.  He remained in jail

8    at the MCC for approximately six months.  I've reviewed

9    carefully the transcript of calls with Capital One and the

10   dispute file.

11             Howe said during his cross that he believed when he

12   called that he had not stayed at the hotel that night, but that

13   there had been a lot of travel to New York.  The credit card

14   company told him that if the merchant, Walberg and Amtrak, said

15   the charges were legitimate, he would have to sign an affidavit

16   contesting them.  That never happened.  Howe did not return the

17   dispute affidavit for any of the disputed charges.

18             I fully understand the government's decision not to

19   call Mr. Howe during the Buffalo Billions case, which

20   definitely made that a harder case to prove.  And I understand

21   their view that the call to Capital One, when he was not one

22   hundred-percent sure that the charges were bad charges, were

23   reckless.

24             All of that said, while it is possible that Howe was

25   trying to scam his credit card company, his explanation of what

1    happened is not entirely unplausible.  In fact, but for Howe's

2    history of lying to merchants to postpone paying Peter so he

3    could pay Paul, I would say there is explanation for what

4    happened is plausible.  The problem is that he has a bad track

5    record, a track record relative to this sort of conduct.

6         In any event, based on the record that I have in front

7    of me, I cannot conclude that he actually violated the

8    cooperation agreement.  If I had reached that conclusion, the

9    sentence I intend to impose would be very different.  Taking

10   into account that assessment of the defendant, federal law

11   requires me to impose a sentence that is reasonable and no

12   greater than necessary to accomplish the goals of sentencing.

13   I've considered all of the sentencing factors as well as the

14   relevant 5K factors.  In terms of what's most important, we

15   start with the seriousness of the offense.

16         Public corruption is one of the most serious of

17   federal crimes.  The sort of corruption Howe was involved in

18   opposed citizen's faith in government.  It tells everyone that

19   the government's decisions are not made on the merits.  It's

20   all about who knows who and who's greasing whose palms.  That's

21   deeply troubling and feeds on itself.  The more the citizens of

22   this state believe that the government is corrupt, the easier

23   it is for public officials to justify to themselves being

24   corrupt.  So, if everyone does it in theory, that minimizes in

25   their own mind their culpability.  And the more people believe

1    that everyone is corrupt, the more likely it is that the public

2    will offer bribes or agree to pay bribes because they really

3    believe that that's the only way to get things done and that's

4    what everyone does.  In short, the public corruption schemes of

5    which Howe was a critical player were very serious crimes.  And

6    I say that not minimizing the theft from Whiteman Osterman &

7    Hanna or the tax evasion.  Those were all serious crimes,

8    though not as serious as corruption.

9        I've considered the need to provide just punishment

10    for Mr. Howe's crime while avoiding unwarranted disparities.

11    The sentences of the other defendants who were involved in the

12    Buffalo Billions, COR and Percoco cases range from time served

13    for Mr. Schuler, who also cooperated to six years.  And some

14    defendants with were ordered to pay very substantial fines.

15    Except for Schuler, those defendants are not similarly

16    situated, because only Kelly accepted responsibility for his

17    actions and he did so only after a full-blown trial, and none

18    of those defendants cooperated.

19        The most similarly situated defendant is Schuler.

20    Schuler is, however, far less culpable than Howe.  He was

21    involved only in the Buffalo Billions case.  He did not

22    personally profit, except as to whatever value he recognized by

23    virtue of the fact that Ciminelli got the contract for the COR

24    project in Buffalo.  And he did not live a life of one fraud

25    after another in the years leading up to the case.

1          On the other hand, Howe's cooperation was more

2    valuable to the government, largely because his criminality was

3    more extensive.  Howe was, as I have said numerous times, a

4    credible witness.  I found his testimony in the Percoco trial

5    to be credible and that he either embellished the defendant's

6    conduct or minimized his own.  I accept the government's 5K

7    letter that he spent hours upon hours of days working with them

8    so that they understood what happened and was able to cogently

9    present what was a complicated case to a jury.

10          I've considered the need to deter criminal conduct.

11          Mr. Howe, there are two aspects of deterrence that we

12    think about when passing sentence, specific deterrence and

13    general deterrence.  Specific deterrence is how do we deter

14    you.  General deterrence is how do we deter people generally.

15    In terms of specific deterrence, specific deterrence is of

16    concern here.

17          While Mr. Howe had some therapy to come to terms with

18    how things could go so wrong, to the extent that he has an

19    element of compulsive spending, I'm not entirely sure that six

20    months of therapy is adequate.  His ability to abide by the

21    terms of pretrial release give me some hope that Mr. Howe will

22    be able to stay on the straight and narrow.  Time spent at the

23    MCC in that regard helps.

24          Mr. Howe, you now know what prison is like.  Hopefully

25    that will be a lasting reminder of what can happen if you again

1   cross the line of illegality.

2           In terms of general deterrence, it's incredibly

3   important in corruption cases to make sure that everyone

4   understands that this sort of crime will be dealt with harshly.

5   It's also important for people to understand that cooperation,

6   which is critical to the government's ability to prosecute

7   cases like this, is rewarded.

8           Lastly, I've considered the need to provide the

9   defendant with needed educational or vocational training,

10  medical care or other correctional treatment.  As to Mr. Howe,

11  this factor comes into play because I believe he needs

12  continued help to make modest living within a middle-class

13  income enough of a habit so that he will not again start

14  chasing fancy living that is beyond his means.

15          Based on all my considerations of the sentencing

16  factors and taking into account his substantial assistance to

17  the government, I find that the guidelines sentence is

18  substantially longer than necessary to achieve the goals of

19  sentencing.

20          Probation recommends time served plus three years of

21  supervised release.  I'm not convinced that three years of

22  supervised release is sufficient time to ensure that the habits

23  that Mr. Howe is building are entirely internalized.

24  Accordingly, I'm going to suspend the submission of sentence

25  and place the defendant on five years of probation.

1          Other than the longer time period, Mr. Howe, the

2     difference between supervised release and probation is the

3     penalty if probation is revoked.  With supervised release, I

4     can only sentence you to the period of supervised release.

5     With probation, I haven't sentenced you yet.  So, all the time

6     that you're facing now, you will be facing if you violate

7     probation.

8          If you've really turned a corner that's all irrelevant

9     because I'll never see you again, and it won't be an issue.  If

10    you haven't, you'll be back in front of me.

11         In addition to the mandatory conditions of probation,

12    I'm imposing the following special conditions -- strike that.

13         These are the mandatory conditions of probation:  The

14    defendant must not commit another crime.  The defendant cannot

15    illegally possess a controlled substance.  The defendant cannot

16    possess a firearm or other destructive device.  I'm waiving

17    mandatory drug testing because the risk of drug abuse is low.

18    The defendant must cooperate in the collection of DNA.

19         In addition to the standard conditions of probation,

20    I'm imposing the following special condition.

21         First, the does the government want the condition that

22    the defendant must continue to cooperate and comply in

23    prosecution of others?

24         MS. ECHENBERG:  We're complete but we'll take that

25    condition.

1          THE COURT:  All right.  I'm going to impose that as a

2    condition.

3          It's highly unlikely that they're going to be calling

4    you for now, but if something comes up, you must continue to

5    cooperate with the government.

6          The defendant must provide 150 hours of community

7    service for every year of probation.  The defendant must

8    continue to pay the IRS a thousand dollars a month against your

9    outstanding tax liability.  The defendant must participate in

10   outpatient mental health treatment, as directed by the

11   probation office.  The defendant must contribute to the cost of

12   services based on your ability to pay or the availability of

13   third-party payments.  I'm authorizing the release of available

14   psychological and psychiatric evaluations, including the

15   presentence report, to the mental health provider.

16         The defendant must not incur credit charges or open

17   new lines of credit without the permission of the probation

18   officer.  The defendant must not make any purchase exceeding a

19   thousand dollars, except for rent and emergency expenditures,

20   without the permission of your probation officer.

21         A pretrial condition is that the defendant's attorney

22   must hold all the defendant's credit cards, except for one.

23   Counsel may now return the credit cards to Mr. Howe, but

24   Mr. Howe must disclose to his probation officer all his credit

25   cards and must provide his probation officer on a request of

his monthly credit card bills.  The defendant must provide the

probation officer with access to any requested financial

information.  He must report to the nearest probation office

within 72 hours of today, and will be supervised by the

district of residence.

I'm not imposing a fine because I find there is no

ability to pay a fine.  To the extent Mr. Howe has available

resources, they are better used to pay his back taxes or to pay

restitution.

There's an agreed-upon order of forfeiture, so

Mr. Howe is ordered to forfeit $2,835,000.  The restitution

amount to Whiteman Osterman & Hanna is $1,706,542.

Correct?

MS. ECHENBERG:  Yes, your Honor.

And you should have a restitution order as well, or I

can pass one up.

THE COURT:  I do.

Okay.  Ms. Stevenson, probation is recommending that

the defendant be required to pay 20 percent of his gross

monthly income and restitution.  He is already paying a

thousand dollars to IRS.

Do you have a position on what percentage makes sense

here?

MS. STEVENSON:  I think it may make sense to the

extent it's possible to think about a graduated payment

1    schedule.  I don't think that his cash flow at the time for

2    this 20 percent.  I think ten percent is probably more

3    reasonable at first, with perhaps the opportunity to increase

4    that over time.

5              THE COURT:  Okay.  What -- I think I know.

6              I think the real issue is whether it's going to be

7    net, or -- whether it's going to be net or the IRS payment,

8    because I'm not sure how much available resources he has beyond

9    the thousand dollars he's paying IRS, which he's not going to

10   live long enough to pay off.

11             MS. STEVENSON:  The answer is not much, your Honor.

12             THE COURT:  All right.  I'm going to make it ten

13   percent net of the IRS payment.  That will change, and the

14   order will provide that if your financial resources change,

15   that's going to change.  And it will be adjusted accordingly.

16   But you've got to live.  Even in Idaho, there's a limit.  So,

17   it's ten percent net of the IRS payments.  I must impose an

18   $800 special assessment.

19             Are there any open counts or any underlyings in the

20   indictment?

21             MS. ECHENBERG:  No, your Honor.

22             THE COURT:  All right.  Mr. Howe, to the extent you

23   have not given up your right to appeal your sentence to your

24   plea of guilty in the agreement you entered into with the

25   government, in connection with that plea, you have the right to

1    appeal.  If you're unable to pay the cost of an appeal, you may

2    apply for leave to appeal *in forma pauperis*.  The notice of

3    appeal must be filed within 14 days of the judgment.

4            Anything further from the government?

5            MS. ECHENBERG:  Yes, your Honor.

6            I understand -- or am I correct in understanding that

7    the five years of probation is on each count concurrent?

8            THE COURT:  Yes.  Thank you.  It's on each count

9    concurrent.

10           Ms. Stevenson, anything further?

11           MS. STEVENSON:  No, your Honor.  Thank you.

12           THE COURT:  Thank you, all.

13           Mr. Howe, good luck.

14           (Adjourned)

15

16

17

18

19

20

21

22

23

24

25